**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **CONTINENTAL CASUALTY COMPANY,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 17-4183** |
| | : | |
| **PENNSYLVANIA NATIONAL MUTUAL** | : | |
| **CASUALTY INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

_____:

**Goldberg, J.**                                                                 **May 22, 2019**

## <u>MEMORANDUM OPINION</u>

This Declaratory Judgment action involves a complicated coverage dispute between two insurers stemming from a significant personal injury settlement. Plaintiff Continental Casualty Company ("CCC") has sued Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") seeking reimbursement from Penn National for settlement sums paid by CCC. Both parties have filed summary judgment motions. For the following reasons, I find that genuine issues of material fact remain that preclude a grant of summary judgment for either party.

## I.     FACTUAL BACKGROUND[1]

### A.     <u>The Accident</u>

On September 15, 2015, Jeremy Esakoff was operating a motorcycle in Reading Township, New Jersey, when he was struck by a GMC Yukon operated by Kathryn Marquet-Sandt. (Pl.'s Mot. Summ. J., Aff. of Melissa Cornibe ("Cornibe Aff."), Ex. A.) At the time of the accident,

---

[1]  Unless otherwise noted, the following facts are undisputed.

Marquet-Sandt was employed by Shady Maple Smorgasboard, Inc. ("Shady Maple"). (Id.) The GMC Yukon (the "Yukon") was owned by Sight & Sound Ministries, Inc. ("SSMI"). (Id.) Marquet-Sandt obtained prior approval from her manager before taking trips on behalf of Shady Maple. (Dep. of Kathryn Marquet-Sandt, May 3, 2018 ("May 3 Marquet-Sandt Dep."), 25:3–26:15.)

On the day of the accident, an SSMI employee, William Luckenbaugh, planned to use the Yukon to travel to a trade show in New York. (Id. at 12:17–20, 17:21–25.) Because Marquet-Sandt was travelling to the same show, she spoke with someone at SSMI about going in the same car as Luckenbaugh. (Id. at 55:1–56:25.) Marquet-Sandt met Luckenbaugh in a parking lot the morning of the trip, at which point she suggested that she drive the car because "he's older and [she] knew it was a long drive." (Id. at 57:1–25.) This was a spur-of-the moment decision, and Luckenbaugh did not have any idea that Marquet-Sandt would be driving before meeting her that morning. (Id. at 103:20–25; Dep. of William Luckenbaugh, July 17, 2018 ("July 17 Luckenbaugh Dep.") 11:14–22.)

Although Marquet-Sandt did not have authority from Shady Maple to borrow the vehicle for any purpose, Shady Maple had no policies barring its employees from borrowing and using vehicles, in the course of Shady Maple's business, which were not owned by the employee or by Shady Maple. ((Def.'s Mot. Summ. J., Ex. D; Dep. of Diane Adamczyk ("Adamczyk Dep.") 17:4–18:17.)

Marquet-Sandt attested to the fact that, at all times she occupied the Yukon, whether as a driver or as a passenger, Luckenbaugh had "the exclusive right to command and control the SUV and had absolute authority to direct the route and manner in which it was driven." (Def.'s Mot. Summ. J., Ex. D.) Because Luckenbaugh's company, SSMI, owned the Yukon, Marquet-Sandt

understood that Luckenbaugh had the right to tell her whether she could drive, where should could drive, and when she had to stop driving. (May 3 Marquet-Sandt Dep. 103–04, 133–36.) Luckenbaugh understood that he had authority to let her drive the Yukon. (Def.'s Mot. Summ. J., Ex. F., Luckenbaugh Dep., Feb. 2, 2017 ("Feb. 2 Luckenbaugh Dep.") 27:7–18.)

Prior to leaving for the trade show, Marquet-Sandt placed various Shady Maple display items and commercial materials in the Yukon for use at the trade show. (May 3 Marquet-Sandt Dep. 58:6–12.) She also used her own GPS. (Id. at 59:16–60:9.) As the two proceeded, Luckenbaugh wanted to make a stop at a McDonalds to use the restroom and then take over driving. (July 17 Luckenbaugh Dep. 8:24–9:17, 12:21–13:17, 16:19–24.) The accident with Esakoff occurred when Marquet-Sandt proceeded to pull off the highway.

### B.    The *Esakoff* Action and Insurance Coverage

Esakoff filed suit in the Philadelphia County Court of Common Pleas (the "Esakoff Action"), naming nineteen defendants, including Marquet-Sandt, SSMI, and other entities affiliated with both SSMI and Shady Maple.[2] (Cornibe Aff., Ex. A.) The amended complaint in that action alleged that the accident was caused by Marquet-Sandt's negligence, and that the remaining defendants were vicariously liable. (Id.)

Non-party Great American Insurance Company ("Great American") issued an insurance policy to a group of Sight & Sound entities ("Sight & Sound"), including SSMI, in the amount of $1 million, and Great American agreed to provide a defense to Sight & Sound in the Esakoff Action. (Cornibe Aff., Ex. F.; Dep. of Andrew Campbell ("Campbell Dep."), 8:7–12.) Plaintiff

---

[2]    These other entities included:  Sight & Sound Management Company, Inc; Sight & Sound Theatres; Sight & Sound Conservatory; Jeffrey Enck; Matthew Neff; Anthony H. Smith; Shirly R. Eschelman; Glenn Eschelman; Shady Maple Companies d/b/a Shady Maple Farm Market, Inc; Shady Maple Foundation; Shady Maple RV, Inc.; Shady Maple Café; Linford Weaver, Martin R. Weaver; Miriam N. Weaver; Phillip Weaver; and Glenn Weaver. (Cornibe Aff., Ex. A.)

CCC issued a commercial umbrella policy to Sight & Sound that provided coverage above certain designated coverage amounts issued to Sight & Sound by Great American. (Cornibe Aff., Ex. H.)

Defendant Penn National issued a business automobile policy to Shady Maple. (Cornibe Aff., Ex. I.) In connection with that policy, Penn National provided a defense to Shady Maple in the Esakoff Action. (Dep. of Matthew Clerkin ("Clerkin Dep."), 21:4–6.) Penn National declined coverage for Marquet-Sandt pursuant to an understanding that Great American would provide Marquet-Sandt primary coverage. (Cornibe Aff., Ex. L.)

During the pendency of the Esakoff Action, various parties were dismissed from the case, leaving only the following defendants: Marquet-Sandt, Shady Maple Companies, Shady Maple Foundation, Shady Maple RV, Inc., Shady Maple Café, and SSMI. (Cornibe Aff., Ex. N.) All of these defendants, except for SSMI, were Penn National insureds. (Cornibe Aff., Exs. I, M.) CCC and Penn National disputed the priority of coverage. CCC asserted that Marquet-Sandt was acting in the scope of her employment for Shady Maple, which was an insured on Penn National's policies. Penn National claimed that its insured, Shady Maple, did not own, hire, or borrow the GMC Yukon and, therefore, it had no coverage obligations.

On November 1, 2017, the Esakoff Action was settled at a private mediation for the sum of $10 million (the "Esakoff settlement"). (Cornibe Aff., Ex. T.) CCC participated in the mediation and contributed $8.7 million to the settlement, while Great American contributed $1 million and Erie Insurance Exchange contributed $300,000. (Dep. of John Kennealy ("Kennealy Dep."), 54:18–55:2; CCC's Resp. Opp'n Summ. J., Ex. 1.)

C. **Pertinent Insurance Policy Provisions**

    1.    The CCC Policy

As noted above, Plaintiff CCC's Commercial Umbrella policy was issued to Sight & Sound, as the named insured, for anything in excess of Great American's policy of $1 million.

The "Coverages" part of the CCC Policy provided:

> We will pay on behalf of the insured those sums in excess of "scheduled underlying insurance," "unscheduled underlying insurance" or the "retained limit" that the insured becomes legally obligated to pay as "ultimate net loss" because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.

(Cornibe Aff. Ex. H.)  The aggregate coverage limit was $15 million.  (Id.)

    2.    The Penn National Business Automobile Policy

The Penn National Business Automobile Policy ("Penn National Primary Policy"), issued to Shady Maple as named insured, provided $1 million of liability coverage as set forth, in pertinent part, in the following provision:

> **A.    Coverage**
> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership maintenance or use of a covered "auto."

(Cornibe Aff., Ex. I, at 418.)  A "covered 'auto'" in this Policy means "Any 'Auto.'"  (Id.)

The Penn National Primary Policy then sets forth "Who Is An Insured":

> The following are "insureds":
>
> a.  You for any covered "auto".:
>
> b.  Anyone else while using with your permission a covered "auto" you own, hire or borrow except:
>
> > (1)  The owner or anyone else from whom you hire or borrow a covered "auto".

5

(Id.)

The "Other Insurance" provision of the Penn National Primary Policy provides:

> a. For any covered "auto" you own, this coverage form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this coverage form is excess over any other collectible insurance. . . .

(Id.)

### 3. The Penn National Excess Policy

The Penn National Excess Policy, also issued to Shady Maple as named insured, had a general aggregate coverage limit of $10 million. The "Coverages" section of this policy provided in part:

> We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or ""property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted . . . However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend.

(Cornibe Aff., Ex. M.)

### D. **Procedural History**

On September 19, 2017, CCC brought suit against Penn National seeking a declaratory judgment that the Penn National Primary and Excess Policies should have responded to any indemnity obligation (by way of settlement or judgment) in the Esakoff Action before the CCC Excess Policy was called upon to respond. Alternatively, CCC seeks a declaration that said policies should have responded on an equal basis. (Compl. pp. 8–9.)

On September 24, 2018, the parties filed the cross-motions for summary judgment that are currently before me.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id. at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). Rather, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and

determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    DISCUSSION

### A.    Penn National's Motion for Summary Judgment

 At issue is CCC's request for equitable contribution from Penn National for some or all of the Esakoff settlement.

Pennsylvania law permits an insured to choose to be indemnified under any policy in effect at the time of the claimed incident, even though other policies may be implicated. Manor Care, Inc. v. Cont'l Ins. Co., No. 01-2524, 2003 WL 22436225, at *5 (E.D. Pa. Oct. 27, 2003) (citing J.H. France Refractories v. Allstate Ins. Co., 626 A.2d 502, 508 (Pa. 1993)). "There is no bar [under Pennsylvania law] against an insurer obtaining a fair share of indemnification or defense costs from other insurers under 'other insurance' clauses or under the equitable doctrine of contribution." Id. (quoting J.H. France, 626 A.2d at 509). "To recover on a claim of equitable contribution under Pennsylvania law, an insurer must show by a preponderance of the evidence that (1) it is one of several parties liable for a common debt or obligation; and (2) it discharged the debt for the benefit of the other parties." Great Northern Ins. Co. v. Greenwich Ins. Co., 372 F. App'x 253, 254 (3d Cir. 2010) (citing In re Mellon's Estate, 32 A.2d 749, 757 (Pa. 1943)).

Penn National contends that CCC cannot meet its burden of proving a right to equitable contribution because:  (1) there is no competent evidence that CCC paid anything towards the Esakoff settlement; (2) CCC paid the settlement money on behalf of multiple parties other than Marquet-Sandt and Shady Maple, and thus CCC cannot meet its burden of showing that it discharged a debt for the benefit of a common insured; (3) Marquet-Sandt was not covered by the Penn National policies, as she was not operating, with Shady Maple's permission, a vehicle

"borrowed" by Shady Maple; and (4) CCC cannot meet its burden of showing that it discharged the debt for the benefit of its common insured, Shady Maple.[3] I address each argument below.

### 1. Whether CCC Paid Anything Towards the *Esakoff* Settlement

Penn National first contends that there is "no competent evidence that CCC paid anything." (Penn National Mem. Supp. Summ. J. 6.) It asserts that although the witnesses identified by CCC have testified that they assume settlement money was paid by CCC, none of them saw or produced a settlement check or other competent proof of payment, despite Penn National's efforts to discover such proof.[4] Because CCC would have no valid claim for reimbursement of money it did not pay, Penn National asserts that it is entitled to summary judgment and that CCC's claim for equitable contribution must be dismissed as a matter of law.

Penn National's argument rests on the mistaken notion that the only way that CCC could prove that it made a payment in accordance with the Settlement Agreement would be to produce a copy of the check it issued. But, CCC need only demonstrate the existence of a genuine issue of material fact. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).

Here, John Kennealy, CCC's insurance claim representative involved with the Esakoff Action, testified that CCC contributed $8.7 million to the settlement. (Kennealy Dep. 54:18–25, 58:20–59:11; see also CCC's Resp. Opp'n Summ. J., Ex. 1.) This evidence is certainly sufficient to defeat summary judgment on this issue. What's more, consistent with the fact that the settlement amount was paid, CCC produced evidence that the Esakoff Action was subsequently concluded

---

[3] Alternatively, Penn National contends that if its insureds, including Shady Maple, had been held vicariously liable, they had a right to be indemnified by the active tortfeasor, Marquet-Sandt.

[4] In its Response in opposition to Penn National's Motion for Summary Judgment, CCC has produced—for the first time—a copy of the settlement check that it purportedly obtained from a third party. Because this settlement check was not produced in discovery, despite the fact that Penn National repeatedly requested this document, I decline to consider it in ruling on the pending summary judgment motions.

via a Praecipe to Settle, Discontinue and End. (Penn National Mot. Summ. J., Ex. M, Dep. of Marc. Zingarini ("Zingarini Dep.") 34:10–35:3.) CCC has also provided a payment screen which indicated the date on the which the settlement check was issued, the amount of the settlement check, and the payee on that check. (CCC's Resp. Opp'n Summ. J., Ex. 2.) Considered collectively, and in the light most favorable to CCC, such evidence raises a sufficient factual dispute that CCC actually paid $8.7 million towards the <u>Esakoff</u> settlement and precludes a grant of summary judgment.

> 2. <u>Whether CCC Paid the Settlement Money on Behalf of Multiple Parties Other Than Marquet-Sandt and Shady Maple</u>

Penn National next asserts that CCC can recover if the settlement money was paid *only* on behalf of Shady Maple—who was a Penn National insured—and not on behalf of any of the other defendants named in the <u>Esakoff</u> Action. Penn National contends that CCC has failed to produce evidence of how the settlement payments were apportioned, meaning that CCC's claim must fail as a matter of law.

When an insurer settles claims against it without determining the amount attributable to claims covered by a policy and those that are not covered by a policy, the court must make an equitable apportionment of the settlement. <u>Cooper Labs. Inc. v. Int'l Surplus Lines Ins. Co.</u>, 802 F.2d 667, 674 (3d Cir. 1986). "While the insured bears the burden of apportioning the settlement payment between covered and non-covered claims, the ultimate allocation is a matter that rests with a sound exercise of the court's equitable discretion." <u>Voest Alpine Indus., Inc. v. Zurich Am. Ins. Co.</u>, No. 02-1605, 2007 WL 1175750, at *3 (W.D. Pa. Apr. 20, 20017). "The allocation is to be made after the parties have had an opportunity to submit their evidence to the court." <u>Id.</u> (citing <u>Am. Home Assurance Co. v. Libbey-Owens-Ford Co.</u>, 786 F.2d 22 (1st Cir. 1986)).

CCC points to what it claims are undisputed facts, which allegedly establishes that the settlement funds were paid solely on behalf of and apportioned entirely to the Penn National insured, Shady Maple and its employee, Marquet-Sandt:

- At the time the <u>Esakoff</u> Action was resolved, the only remaining defendants in the case were Marquet-Sandt, Shady Maple Companies, Shady Maple Foundation, Shady Maple RV, Inc., Shady Maple Café, and SSMI. Aside from SSMI, all of these entities were Penn National insureds.[5]

- Defense counsel, retained by Penn National on behalf of Shady Maple, prepared a March 29, 2017 "Interim Suit Report" in which he opined that Marquet-Sandt had 100% liability, and that Shady Maple had vicarious liability for 100% of any verdict. (Cornibe Aff., Ex. O.)

- In a claim file entry, Penn National's claim representative in the <u>Esakoff</u> Action agreed and stated that "the operator of the vehicle will be liable for this loss. Vicarious liability will apply to Shady Maple since the operator was our employee." (Cornibe Aff., Ex. P.)

- The <u>Esakoff</u> Release contains the following language: "It is expressly understood that no portion of the aforementioned settlement amount is being paid on behalf of Sight and Sound Ministries, Inc. to resolve any alleged direct or vicarious liability of Sight and Sound Ministries, Inc." (the "SSMI language"). (Cornibe Aff., Ex. T.)

- CCC's insurance claim representative, assigned to the <u>Esakoff</u> Action, testified that CCC's contribution was paid entirely on behalf of Marquet-Sandt and Shady Maple:

  > Q.     And in the beginning of the release where it says the $10 million was paid for Sight and Sound Ministries, Inc., in exchange for this release, was that true or false.
  > . . .
  > A.     It reads that way, Sight and Sound Ministries is included there in that preamble. But I can tell you that the money was paid on the two culpable parties, Sandt and Shady Maples.
  > Q.     And is that recorded or memorialized anywhere other than Kennealy 1 and the term sheet from the mediation?
  > A.     That the monies were paid on behalf of those two entities?

---

[5]     (See Cornibe Aff., Ex. N (consisting of (a) two orders dismissing on summary judgment, as uncontested, defendants Enck, Neff, Smith, Shirley Eschelman, Glenn Eschelman, Sight & Sound Management Company, Inc., Sight and Sound Theaters, and Sight & Sound Conservatory; and (b) an order granting summary judgment to Linford Weaver, Marvin Weaver , Miriam Weaver, Phillip Weaver, and Glenn Weaver, but denying summary judgment as to Shady Maple Companies, Shady Maple Foundation, Shady Maple RV, Inc., and Shady Maple Café).)

> Q.    That money was not paid on behalf of Sight and Sound Ministries, Inc.
> A.    I'm not sure.
> Q.    Who was the money paid for?
> A.    It was paid on behalf of Marquet-Sandt and Shady Maples.
> Q.    And what about all these other named entities in the case that the money was paid on their behalf?
> A.    I think the entities are listed, because these are the entities that were originally named in the Complaint. And so to be inclusive, we wanted the release to reflect how the original pleadings were pled.
> Q.    So is it your testimony that the settlement monies were not paid on behalf of any entity other than Sandt and one of the Shady Maple entities?
>                              . . .
> A.    I would say it was paid on behalf of Sandt and Shady Maples.

(Kennealy Dep. 18:9–20:5.)

In response, Penn National points to the following facts, which, it suggests, establishes that the settlement amount paid by CCC was not limited to the liability of Marquet-Sandt and Shady Maple:

- According to the Settlement Agreement and Release of All Claims in the Esakoff Action (the "Esakoff Release"), the settlement amount of $10 million was paid on behalf of the nineteen entities originally named in the Esakoff action:

> That the Undersigned, JEREMY ESAKOFF and DENISE ESAKOFF, husband and wife ("Releasors"), behing of lawful age and sound mind, upon sole consideration of Ten Million dollars ($10,000,000.00) from Defendants, Kathryn Marquet-Sandt, Sight and Sound Ministries, Inc., Sight and Sound Management, Company, Inc., Sight and Sound Theaters, Jeffrey Enck, Matthew Neff, Anthony H. Smith, Shirley Eshelman, Glen Eshelman, Shady Maple Smorgasboard, Inc., Shady Maple Companies, Shady Maple Foundation, Shady Maple Smorgasbord, Inc., Shady Maple Companies, Shady Maple Foundation, Shady Maple RV, Inc., Shady Maple Café, Linford Weaver, Martin R. Weaver, Miriam N. Weaver, Phillip Weaver, and Glenn A. Weaver, Jr. to the undersigned in hand paid receipt whereof is hereby acknowledged, to hereby and for their heirs, executors, administrators, successors and assigns release, acquit and forever discharge Defendants . . . and certain other of their insurers, Great American Insurance Company, Erie Insurance Exchange, and Continental Casualty Company . . . of

> and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever . . . on account of . . . all KNOWN AND UNKNOWN, FORESEEN AND UNFORESEEN bodily and personal injuries and property damage . . . from the accident, casualty or event which occurred on or about September 15, 2015.
>
> . . .

(Cornibe Aff., Ex. T.)  Penn National emphasizes that, of these Defendants, at least seven are not Shady Maple entities or personnel, and thus not Penn National insureds.

- At the time of settlement, SSMI remained a viable defendant in the <u>Esakoff</u> Action, meaning that a portion of the settlement sum was potentially paid for release of claims against Sight & Sound.  Indeed, Sight & Sound had filed a motion for summary judgment in the <u>Esakoff</u> Action claiming that Marquet-Sandt was acting in the scope of her employment for Shady Maple.  The trial court denied the motion, noting that, at the time Marquet-Sandt was driving the Yukon, it was possible that she was acting as Sight & Sound's servant and agent.  (Penn National's Mot. Summ. J., Ex. W.)  Specifically, the trial court stated in part:

> Here, [the <u>Esakoff</u>] Plaintiffs have adduced an abundance of evidence demonstrating that Ms. Marquet-Sandt was acting as a servant and agent of the Sight and Sound Defendants and that she was engaged in a joint enterprise with the Sight and Sound Defendants . . . Mr. Luckenbaugh, in his position for the Sight and Sound Defendants, gave Ms. Marquet-Sandt permission to drive the 2013 GMC Yukon and directed the route to the trade show . . . immediately after the subject accident Sight and Sound Defendants were notified of the accident, and a Sight and Sound Defendants' employee drove to New Jersey to collect both Mr. Luckenbaugh and Ms. Marquet-Sandt, evidence that the Sight and Sound Defendants *continued* to control Ms. Marquet-Sandt after the accident.

(<u>Id.</u>)

- Because SSMI was still a defendant in the case accused of being vicariously liable for the negligence of Marquet-Sandt, Sight & Sound's counsel participated in the mediation. (Dep. of John Delaney, III ("Delaney Dep.") 47:11–24.)

In addition to this evidence, Penn National posits that the SSMI language in the <u>Esakoff</u>

Release was a "sham designed to fool the Court as to the purpose and nature of the payment."

(Penn National's Mem. Supp. Summ. J. 9.)  Penn National argues that CCC employees admitted

that the SSMI language was put in to the Release only at the behest of CCC to preserve CCC's

potential claims against Penn National. (<u>See</u> Dep. of Anthony McMahon ("McMahon Dep.") 15:18– 25 ("[I]t appears [the language] was put in there to protect [CCC]'s ability to pursue recovery potentially and also because it was based on the facts at the time that the case was ongoing that there was a belief that Sight and Sound had no liability in the matter."); Kennealy Dep. 14:9– 16:7 (noting that one of the purposes of the SSMI language was to assist in pursuit of Penn National).)

Finally, even taking the SSMI release language as true, Penn National contends that such language states only that the settlement money was not paid on behalf of SSMI, meaning that it had to have been paid for the benefit of both Marquet-Sandt and Shady Maple. Indeed, CCC's Rule 30(b)(6) deponent expressly testified that its contribution was paid on behalf of Marquet-Sandt and Shady Maple, without apportioning the payment between the two. (Kennealy Dep. 18:9–19:23.) Because only Shady Maple is Penn National's insured, to the extent any money was paid solely for the individual liability of Marquis-Sandt, Penn National claims it would have no obligation to reimburse CCC for such payments.

The conflicting evidence set out above raises a genuine issue of material fact as to the true allocation of the settlement funds paid out in the <u>Esakoff</u> Settlement. CCC points to evidence that all of the settlement money was paid to cover Shady Maple, as vicariously liable for Marquet-Sandt's negligence in the scope of her employment. But Penn National has pointed to evidence that SSMI was still a viable defendant at the time of the settlement and that, according to the trial judge, Marquet-Sandt was potentially acting as SSMI's agent at the time of the accident. Thus, there remains a question of fact that at least some of the settlement was paid on SSMI's behalf.

"[A] claim for equitable contribution calls upon the power of the court to design a remedy that is fair. Fairness cannot be fashioned from speculation." <u>Great Northern Ins.</u>, 372 F. App'x at

256.  Where, as here, "there is a material issue of fact as to how the settlement amount was allocated, that finding should be made at a trial and not on summary judgment."  <u>Am. Home Ass.</u>, 786 F.2d at 31; <u>see also</u> <u>Voest</u>, 2007 WL 1175750, at *3.

3.    <u>Whether Marquet-Sandt Was Covered by the Penn National Policies</u>

Penn National's next argument in support of its Motion for Summary Judgment alleges that it owes no reimbursement to CCC because the Penn National policy to Shady Maple is triggered only by operation of vehicles "borrowed" by the insured.  According to Penn National, because Marquet-Sandt was not operating a vehicle that was "borrowed" by Shady Maple, the Penn National policy provides no coverage.

"An insurer's obligation to provide a defense for claims asserted against its insured is contractual, and the language of the policy will determine whether an insurer has a duty to defend." <u>Colony Ins. Co. v. Mid-Atlantic Youth Servs. Corp.</u>, 485 F. App'x 536, 538 (3d Cir. 2012).  "Under Pennsylvania law, 'the interpretation of a contract of insurance is a matter of law for the courts to decide.'"  <u>Allstate Prop. & Cas. Ins. Co. v. Squires</u>, 667 F.3d 388, 390–91 (3d Cir. 2012) (quoting <u>Paylor v. Hartford Ins. Co.</u>, 640 A.2d 1234, 1235 (Pa. 1994)).  The court must ascertain the intent of the parties from the language of the policy.  <u>Id.</u>  When the policy language is clear and unambiguous, the court will give effect to that language.  <u>Id.</u>  "Ambiguity exists if the contract language is 'reasonably susceptible of different constructions and capable of being understood in more than one sense.'"  <u>Whitmore v. Liberty Mut. Fire Ins. Co.</u>, No. 07-5162, 2008 WL 4425227, at *3 (E.D. Pa. Sep. 30, 2008) (quoting <u>Madison Constr. Co. v. Harleysville Mut. Ins. Co.</u>, 735 A.2d 100, 106 (Pa. 1999)).

The Penn National Business Automobile Policy ("Penn National Primary Policy") provides liability coverage, in pertinent part, in the following provision:

### A.  Coverage

We will pay all sums an "insured" legally must pay as damages
because of "bodily injury" or "property damage" to which this
insurance applies, caused by an "accident" and resulting from the
ownership maintenance or use of a covered "auto."

(Cornibe Aff., Ex. I.)   A "covered 'auto'" in this Policy means "Any 'Auto.'"  (<u>Id.</u>)

The Penn National Primary Policy then sets forth "Who Is An Insured":

The following are "insureds":

a.  You for any covered "auto:.

**b.  Anyone else while using with your permission a covered "auto"
you own, hire or borrow except:**

(1)   The owner or anyone else from whom you hire or
borrow a covered "auto".

(<u>Id.</u> (emphasis added)).

Pursuant to the above provisions, the Penn National auto policy covers Shady Maple's

vicarious liability for Marquet-Sandt's negligence only if Marquet-Sandt had "borrowed," with

Shady Maple's permission, the SSMI vehicle.

"In construing an insurance policy, if the words of the policy are clear and unambiguous,

the court must give the words their plain and ordinary meaning.  <u>Pacific Indem. Co. v. Linn.</u>, 766

F.2d 754, 760–61 (3d Cir. 1985).  Although the dispute here thus turns on the definition of the

term "borrow," the policy does not define this term, and it is not a technical insurance term with a

strict legal meaning.[6]  Webster's Dictionary defines "borrow" to mean "to take from another by

request and consent, with a view to return the thing taken and return it or its equivalent."  <u>Northland</u>

<u>Ins. Co. v. Lincoln Gen. Ins. Co.</u>, 153 F. App'x 93, 97 n.3 (3d Cir. 2005) (quoting <u>Webster's New</u>

---

[6]   <u>See</u> <u>Hanneman v. Cont'l Western Ins. Co.</u>, 575 N.W.2d 445, 450–51 (N.D. 1998) (noting that
"borrow" has no strict legal meaning in the insurance context); <u>State Farm Fire & Cas. Co. v. Am.</u>
<u>Hardward Mut. Ins. Co.</u>, 482 S.E.2d 714, 717 (Ga. 1997) (noting that "borrow" does not have a
technical or unique meaning).

Universal Unabridged Dictionary, 211 (2d ed. 1983)).  This language provides little guidance in the context of the dispute before me.  Pennsylvania law does not clearly define the term "borrow" as used in the insurance policy provisions at issue, and the various states' laws offer conflicting guidance on the meaning of the term "borrow" as used in an automobile insurance policy.

One line of cases, which CCC urges me to adopt, is that an employer "borrows" a vehicle when it temporarily gains the use of a third party's vehicle for its purposes.  For example, in Travelers Indemnity Co. v. Swearinger, 169 Cal. App.3d 779 (Cal. Ct. App. 1985), the California Court of Appeals considered the meaning of the term "borrow" in an automobile insurance policy. The court found that an entity, which can only operate through individuals, "can borrow a vehicle whenever it properly gains the use of a third party's vehicle for its purposes whatever may be said of the employee's dominion over the vehicle (by ownership) or physical possession of it (by driving it)."  Id. at 785.  The court remarked that it is not the chattel itself which is of concern to the insurance company, but rather "the injurious consequences of the use of the vehicle which it is the purpose of the policy to indemnify."  Id.  This interpretation invokes one of the definitions of "borrow" in the Oxford English Dictionary, "to make temporary use of something not one's own." Id.  Applying this definition to the facts before it, the California court held that a school district had "borrowed" a family's car when the school district secured transportation for a visiting pupil through a host family driving its own car, but for the school's purposes.  Id. at 788.

Similarly, in Andresen v. Employers Mut. Cas. Co., 461 N.W.2d 181 (Iowa 1990), the Iowa Supreme Court considered the meaning of the term "borrow" in an almost identical automobile insurance policy and adopted the definition from Swearinger.  Id. at 184–85.  In that case, the plaintiff, Andresen, had been employed by First Bank to shovel snow at a property owned by the bank.  Id. at 182.  Although the bank ordinarily furnished Andresen with one of its vehicles,

those were not available on the day in question and Andresen was directed to use his own.  Id.  The bank agreed that whenever Andresen used his own car on bank business, it would pay him a certain amount per mile driven.  Id. at 182–83.  While performing bank duties with his own automobile, Andresen was seriously injured in a car collision caused by another driver.  Id. at 183.  Andresen sought to recover under the bank's underinsured motorist coverage, but the insurance company argued that Andresen's auto was not "borrowed" because the auto never left its owner's (Andresen's) possession.  Id.  The Iowa Supreme Court rejected this argument, holding that "a vehicle is borrowed when someone other than the owner temporarily gains its use."  Id. at 185.  It found that the bank "temporarily gained the use of Andresen's vehicle as a substitute for its own, regardless of the fact that Andresen himself—as a bank employee—drove the car on the bank's business."  Id.

A second line of cases on the term "borrow" has deemed Swearinger and its progeny the "minority" view.  See Selective Ins. Co. of S. Carolina v. Sullivan, 694 F. App'x 379, 384 (6th Cir. 2017) (holding that the Swearinger definition of "borrow" is a minority view).  Under an expanded definition of "borrowed," the term has been construed to mean more than merely receiving some benefit from another's use of a third person's vehicle.  Under this "majority view," "borrowing" a car also "requires possession reflecting dominion and control over the vehicle."  Schroeder v. Bd. of Supervisors of La. State Univ., 591 So.2d 342, 347 (La. 1991).

Schroeder v. Board of Supervisors of Louisiana State University is typically cited as articulating this expanded, "majority" view.  In Schroeder, a high school student, Eric, drove his father's car to University Laboratory School on the Louisiana State University ("LSU") campus, where he attended high school.  Id. at 344.  On the way, the student picked up a classmate, Brad, and purchased a six-pack of beer, which they consumed in the parking lot.  Id.  The boys had

arrived at school around 12:30 p.m. to participate in school-sponsored and chaperoned events.  Id.

Later that afternoon, a faculty sponsor asked if Brad would pick up ice and gave him money.  Id.

Without the sponsor's knowledge, Brad asked Eric to drive him to get the ice and, on the way

back, Eric collided with another car.   Id.  Eric's family filed suit against LSU and its insurers

seeking coverage on the basis that LSU was vicariously responsible for the tortious conduct of

Eric, and that Eric was an insured under LSU's policy.  Id.  The Louisiana Supreme Court rejected

the interpretation of "borrow" espoused in Swearinger and concluded that "[t]he evidence adduced

in support of [] summary judgment does not establish beyond genuine dispute that LSU acquired

or exercised possession, dominion, control, or even the right to direct the use of the vehicle in

question" even though the students were using the vehicle for the school activities.   The court

declined to affix liability to LSU or its insurer even though LSU "may have benefitted from its use

by the students."   Id. at 347.

Similarly, in Atlantic Mutual Ins. Co. v. Palisades Safety & Ins. Co., No. A-3608-01T1,

2003 WL 22100231 (N.J. Super. July 22, 2003), the New Jersey Superior Court faced a question

as to whether an insured was a "borrower" for purposes of an automobile insurance policy.  Id. at

*1.  In that matter, Cedar Johnson was operating his wife's vehicle when he struck another car.  Id.

At the time of the accident, Johnson and his passenger, Daniel LaVienna, were employed by

Cambridge Frozen Bakery Products ("Cambridge"), and were returning from the home of

Cambridge's president, Majewski, who had sent them to his home to retrieve his prescription

medicine.  Id.  Neither man had "punched out," and both remained "on the clock," and therefore

were working for Cambridge during the trip.  Id.  When the victim sued the Johnsons, Cambridge,

and Majewski for negligence, Cambridge's insurance company denied coverage on behalf of

Majewski, arguing that Majewski was not an insured under the policy because he did not "borrow"

the car with Cambridge's permission.  Id.  The New Jersey Superior Court disagreed, finding that a person becomes a borrower when he or she "assume[s] a certain amount of control, dominion or power over the object being borrowed" and where the "user" of the vehicle has simultaneous authority to move the vehicle in order to be considered a "borrower."  Id. at *2–3.  Under that definition, the court concluded that Johnson's auto was "borrowed" by Cambridge because Cambridge's use of its employee's automobiles was a "daily occurrence," Johnson admitted that he believed that the performance of these tasks was a part of his job, and when running errands, the employees remained "on the clock" and "receiv[ed] pay."  Id. at *3.

Upon consideration of the above case law, I will adopt the "majority view" of "borrow," which necessitates the exercise of dominion and control together with the simultaneous authority to move the vehicle.  Requiring this type of substantial possession and control over the vehicle requires more than simply receiving the benefit of the item; it "implies that when something is borrowed, the borrower assumes control of the object."  Reliance Ins. Co. v. Lexington Ins. Co., 361 S.E.2d 403, 433 (N.C. Ct. App. 1987).  But, as explained below, adopting the majority view of "borrow" does not result in summary judgment in Penn National's favor because a genuine issue of material fact remains as to whether Shady Maple, acting through Marquet-Sandt, "borrowed" the SSMI vehicle for its use.

Penn National offers multiple facts which allegedly establish that Marquet-Sandt, as an employee of Shady Maple, never acquired control, dominion, or possession over the SSMI vehicle. First, Marquet-Sandt testified that SSMI and Shady Maple jointly promoted a dinner-and-a-show package, wherein special pricing would be offered for seeing a play at Sight & Sound and eating at Shady Maple.  (May 3 Marquet-Sandt Dep. 34:4–20.)  As a result, Marquet-Sandt would often travel to events with someone from SSMI because the two companies promoted each other.  (Id.

at 34:21–35:14.)  Thus, Penn National notes that the vehicle was used for a joint purpose and was not under the control of Marquet-Sandt.  Penn National also points out that, on the day of the accident, the vehicle was owned by SSMI and had a wrap-around SSMI decal on the outside, thereby functioning as a moving advertisement for SSMI.  (Id. at 58:17–23.)

Penn National also stresses that, with respect to the particular trip in question, Marquet-Sandt testified that that she never made any arrangements with either Shady Maple or with Mr. Luckenbaugh about driving the SSMI vehicle.  Rather, she explained that it was a last-minute decision:

> Q.  So it's your testimony today that there were no conversations between you and Mr. Luckenbaugh before that day that you would drive either way?
> A.  No.
> Q.  So it was a spur-of-the moment decision?
> A.  Yes.
> Q.  Okay.  What made you decide that day that you should offer?
> A.  Well, I found out how long the trip would be and I felt bad that Bill would be doing all the driving.  And he's older.  I was only trying to be nice.  I didn't mean anything by it.  I didn't, I didn't tell Bill I was going to do this.  I suggested.
> Q.  Okay.  You suggested on the spur of the moment, but you had your GPS with you; right?
> A.  Yes.

(May 3 Marquet-Sandt Dep. 103:13–105:7.)

Penn National also stresses that Marquet-Sandt testified that she did not have control of the SSMI vehicle:

> Q.      Now in terms of who had control or command of the Sight and Sound vehicle when you were driving.  Okay?  If you were given some instruction that you didn't agree with, your choices were to either follow it or stop driving; is that correct?
>                                     . . .
> A       Yes.
> Q.      I mean, you understood that Mr. Luckenbaugh had the right to tell you whether you could drive, where you could drive, when you had to stop driving?

A.      Yes.
Q.      Okay.  Is it fair to say that you could refuse to do things you
didn't agree with, but you couldn't drive in a way that he didn't
agree with?
A.      Yes.

. . .

Q.      If, when you showed up that morning of the accident, when
you met up with Mr. Luckenbaugh?
A.      Yes.
Q.      If he had declined your offer to drive, what would you have
done?
A.      Fine.  I would have got in the passenger seat and went with
him.
Q.      If he had told you to stop at some point what would you have
done.

. . .

A.  I would have stopped, if it was reasonable.  I mean.
Q.  Well, if he told you—
A.  If he wanted coffee or anything, I would stopped [sic].  Yes.
Q.  If he wanted you to stop driving would you have stopped?

. . .

A.  Yes.
Q.  If he told you take different directions would you have taken
different directions?

. . .

A.  Yes.

(May 3 Marquet-Sandt Dep. 133:12–136:1.)

In an affidavit dated November 3, 2017, Marquet-Sandt again attested to the fact that she

"did not borrow the SUV," but rather merely agreed to drive part of the round trip as a favor to

Luckenbaugh.  She stated that while she was occupying the SUV, either as a driver or passenger,

Luckenbaugh had the exclusive right to command and control the SUV and had absolute authority

to direct the route and manner in which it was driven.  (Def.'s Mot. Summ. J., Ex. D)  The affidavit

states that she understood that, at all times, the SUV was being used by Mr. Luckenbaugh and

SSMI for purposes of SSMI's business, and that she did not have authority from Shady Maple to hire or borrow the vehicle for any purpose.[7] (Id.)

In response, CCC offers the following contradictory facts suggesting that Shady Maple, acting through Marquet-Sandt, borrowed the vehicle:

- Marquet-Sandt stated that she traveled with SSMI in their vehicle on approximately five or six other times when she was going to a trade show on behalf of Shady Maple and had previously driven the SSMI vehicle. (May 3 Marquet-Sandt Dep. 38:14–20, 42:10–25, 99:11.) According to Marquet-Sandt, Shady Maple was aware that she travelled in the Sight and Sound vehicle on those occasions. (Id. at 40:17–41:13.)

- On the day of the accident, Shady Maple was aware that Marquet-Sandt was travelling with Luckenbaugh to the trade show in the SSMI vehicle. Although Marquet-Sandt did not recall specifically telling Shady Maple that she would be driving, she did not know for sure whether anyone from Shady Maple knew she had driven in the past or whether she would be driving on this particular occasion. (Id. at 56:18–57:27, 105:3–14.)

- Shady Maple had no policy barring employee use of vehicles they do not own for business purposes. (Adamczyk Dep. 18:1–17.)

- At the time of the accident, Marquet-Sandt was on her way to a trade show as a representative of Shady Maple. (Cornibe Aff., Ex. B, ¶ 10; May 3 Marquet-Sandt Dep. 51, 56.) Marquet-Sandt was travelling on behalf of Shady Maple and placed various Shady Maple display items and commercial materials for use at the trade show in the SSMI vehicle. She also used her own GPS to navigate the trip. (Id. at 57:15–23, 58:6–60:9.)

- Although Marquet-Sandt believed that Luckenbaugh, as an employee of the vehicle owner, had the right to control the SSMI vehicle, she admitted that she had actual physical control over the vehicle. (Id. at 59:16–23, 106:17–19.)

---

[7] Penn National cites to testimony from Diane Adamczyk, the Shady Maple Director in charge of insurance and litigation, wherein she states that Shady Maple did not ask Penn National to provide coverage for Marquet-Sandt and believed that the Penn National policies did not apply because Shady Maple did not "borrow" the SSMI vehicle. (Def.'s Mem. Supp. Mot. Summ. J. 16 & Ex. G.) Shady Maple's legal analysis of which insurance covered the accident is not probative of the factual determination of whether Marquet-Sandt "borrowed" the SUV.

Moreover, although issues of credibility, standing alone, cannot defeat summary judgment,[8] CCC implies that Penn National coerced Marquet-Sandt's affidavit and that her deposition testimony is not credible. Penn National's corporate designee and Shady Maple's insurance broker both testified that this lawsuit was one of the biggest lawsuits they had ever faced on a liability policy, thereby giving them incentive to avoid liability. (Adamczyk Dep. 34:11–17; Dep. of J. Bradford Forney ("Forney Dep.") 28:12–15.) When Shady Maple's representatives, and Penn National representatives met to strategize regarding coverage for the Esakoff claim, the expectation was that Sight & Sound would bear primary liability on the case and, if it did not work out, then Shady Maple would pursue Marquet-Sandt as a driver. (Dep. of Glenn Weaver ("Weaver Dep.") 55:5–15, 75:6–76:19.) Then, on November 3, 2017, Marquet-Sandt was called into a Shady Maple conference room with Glenn Weaver, Shady Maple's CFO; Peter Speaker, Penn National's coverage counsel; Brad Forney, Shady Maple's insurance broker; and three other unknown people. (May 3 Marquet-Sandt Dep. 89:2–94:9.) Marquet-Sandt's coverage counsel, Marc Zingarini was not in the room and was not contacted about the meeting. (Zingarini Dep. 35:4–15.) Marquet-Sandt was given the affidavit and was told that if she had any changes to be made, to make them. (May 3 Marquet-Sandt Dep. 94:21–95:13.) She admitted that she did not understand some of the provisions in the affidavit, in particular the statement that she believed that she would be covered by SSMI's insurance policies on its SUV. (Id. at 107:16–25, 108:22–109:24.) She also did not fully understand the legal implications of her statement that she did not "borrow" the SSMI vehicle.

---

[8] "[I]f a moving party has demonstrated the absence of a genuine issue of material fact—meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead the nonmoving party must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998).

(Id. at 112:6–25.)  Finally, despite the fact that the affidavit indicated that she had reviewed Shady Maple's insurance policies, she actually had not reviewed them at that time.  (Id. at 113:1–25.)

In light of this record, and the facts identified by both parties, there remains a genuine issue of material fact as to whether Marquet-Sandt "borrowed" the SSMI vehicle on behalf of her employer, such that Shady Maple had possession reflecting dominion and control over the vehicle. CCC has pointed to some evidence suggesting that Shady Maple regularly, through Marquet-Sandt, used SSMI vehicles for its business purposes, that Shady Maple was using the Yukon on the day of the accident, and that Shady Maple's employee assumed possession reflecting dominion and control over the Yukon's movement on the day of the accident.  On the other hand, Penn National has presented evidence that Shady Maple did not authorize Marquet-Sandt to drive the Yukon on the day of the accident and that SSMI, through its employee Luckenbaugh, retained full control over the vehicle at all times.  As a reasonable factfinder could find in favor of either party, summary judgment is not appropriate.

    4.  Whether CCC Can Meet Its Burden of Showing that It Discharged the Debt for the Benefit of a Common Insured

Finally, Penn National contends that even if one disregards the language of the Esakoff Release and considers for whom the money *should* have been paid, Penn National still has no obligation to CCC.  Penn National argues that the money should have been paid for Marquet-Sandt, as she was the only primary, active tortfeasor, and that the release of Marquet-Sandt automatically extinguished the vicarious liability of the other eighteen defendants.  Because Marquet-Sandt was not insured by Penn National, Penn National claims that CCC has no right to reimbursement for settlement money it paid on her behalf.

This argument again turns on how the settlement funds were allocated.  If the funds were paid for Marquet-Sandt acting in the course and scope of her employment for Shady Maple, Penn

National could potentially have liability. If the funds were paid for Marquet-Sandt acting only in her individual capacity, Penn National would not have liability. These facts remain in dispute and, as such, for the reasons set forth above, I cannot decide this issue on summary judgment.

5.   Whether Penn National's Insureds, Including Shady Maple, Had a Right to Be Indemnified by CCC's Insured, Marquet-Sandt, as the Active Tortfeasor

In an alternative theory, Penn National argues that, under all factual scenarios, Marquet-Sandt was the active tortfeasor and, therefore, ultimately liable for the accident. Penn National posits that if other defendants, including Shady Maple, had been held vicariously liable based on Marquet-Sandt's negligence, Shady Maple could have pursued indemnification from her as a matter of law. Since she was not insured by Penn National, CCC has no right to reimbursement for any money it paid on her behalf.

This argument turns entirely on speculation. Even if I could conclude as a matter of law that Marquet-Sandt was not an insured, Shady Maple remained an individually-named defendant in the Esakoff Action with a cross-claim against the Sight & Sound entities, but made no claim against Marquet-Sandt at that time. Having failed to initiate any indemnity action against Marquet-Sandt, it is too great a leap to find that Marquet-Sandt owed indemnity to Shady Maple, as a matter of law, such that Penn National's obligations were eliminated.

**B.   CCC's Motion for Summary Judgment**

CCC's Cross-motion seeks summary judgment in its favor and reimbursement of the full $8.7 million paid to resolve the Esakoff Action. It contends that Shady Maple is a mutual insured of Penn National and CCC, and that Marquet-Sandt—having "borrowed" the SSMI vehicle on behalf of her employer, Shady Maple—is also a mutual insured of Penn National and CCC. CCC reasons that because Penn National's coverage stands first in priority when compared to the CCC

policy, Penn National is liable as a matter of law for some portion, if not the full amount, of the Esakoff settlement.

As set forth in detail above, however, the analysis is not that simple. Questions of material fact remain regarding (a) what amount of the Esakoff settlement was paid on behalf of Shady Maple as vicariously responsible for Marquet-Sandt, and what amount was paid on behalf of SSMI; and (b) whether Marquet-Sandt "borrowed" the SSMI vehicle such that she was an insured under the Penn National policy. Absent resolution of those factual disputes, I cannot determine what policy stands in first priority on the claim. Accordingly, I will also deny CCC's Motion for Summary Judgment.

## IV.    CONCLUSION

In light of the foregoing, I find that genuine issues of material fact remain that preclude the entry of summary judgment for either party. Accordingly, I will deny the Cross-motions for Summary Judgment and schedule a trial in this matter.