**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONTINENTAL CASUALTY COMPANY,** | : | CIVIL ACTION |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | No. 17-4183 |
| | : | |
| **PENNSYLVANIA NATIONAL MUTUAL** | : | |
| **CASUALTY INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                      **March 12, 2021**

## <u>MEMORANDUM OPINION</u>

This Declaratory Judgment action involves a coverage dispute between two insurers stemming from a car accident and a significant personal injury settlement.  Plaintiff Continental Casualty Company ("Continental") has sued Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") seeking reimbursement from Penn National, under an equitable contribution theory, for settlement sums paid by Continental.  On May 22, 2019, I denied the parties' cross-motions for summary judgment, finding that genuine issues of material fact remained.

On September 24, 2020, I presided over a bench trial on the limited, but potentially dispositive issue of whether Penn National's insured "borrowed" the vehicle involved in the accident, which would trigger Penn National's liability under the Penn National insurance policies. Having considered the trial record, I find that Penn National's insured did not "borrow" the vehicle and will grant judgment in favor of Defendant Penn National and against Plaintiff Continental.

I.   **FACTUAL BACKGROUND**[1]

A.   <u>**The Accident**</u>

On September 15, 2015, Jeremy Esakoff was operating a motorcycle in Reading Township, New Jersey, that was struck by a GMC Yukon (the "Yukon") operated by Kathryn Marquet-Sandt. (Stipulation of Facts No. 1 ("Stip. 1"),[2] 8/10 Stip. ¶¶ 1, 2, 42 .)  At the time of the accident, Marquet-Sandt was employed by Shady Maple Smorgasboard, Inc. ("Shady Maple") and was driving the Yukon to attend a work-related marketing event.  (8/10 Stip. ¶ 5; Sept. 24, 2020 Trial Transcript ("Trial Tr.") 67:10–16.)  The Yukon was owned by Sight & Sound Ministries, Inc. ("Sight & Sound").  (8/10 Stip. ¶¶ 2–3.)  As a result of the accident, Mr. Esakoff sustained significant injuries.  (<u>Id.</u> ¶ 4.)

Marquet-Sandt had been an employee of Shady Maple for about seven years, and held the title of "Group and Event Sales."  (Trial Tr. 16:3–7.)  In the scope of that position, and in order to promote business for Shady Maple, Marquet-Sandt travelled on day trips three to four times a week, and on overnight trips every two to three months.  (<u>Id.</u> 19:3–11, 20:4–7.)  She recalled travelling approximately 120 miles per week.  (<u>Id.</u> at 19:22–24.)  In September of 2015, the month of the accident, Shady Maple did not have a policy in place regarding what car Marquet-Sandt was

---

[1]      For purposes of post-trial briefing, the parties were directed to include a record citation for each proposed finding of fact.  In a separate Motion to Strike, Continental argues that "Penn National's post-trial submission contains proposed findings of fact which contain no reference to the record evidence and instead rely upon documents that the Court has deemed not relevant and, therefore, inadmissible."  (Continental Motion to Strike, ECF No. 103, p. 2.)  Continental moves to strike any portion of Penn National's post-trial submission that does not contain a reference to record evidence.

In reaching my decision, I considered only facts that are properly supported by the admissible evidence of record.  Accordingly, I need not separately consider this Motion and will deny it as moot.

[2]      Stipulation No. 1 consists of two letters dated August 10, 2020 and September 17, 2020. The first letter will be referred to as the "8/10 Stip." and the second letter will be referred to as the "9/17 Stip."

supposed to use for company travel.  (Id. at 24:21–23.)  Shady Maple would reimburse Marquet-Sandt for her travel, including her mileage and other expenses.  (Id. at 23:21–24:3.)  The Chief Human Resources Officer for Shady Maple, Diane Adamczyk, testified that it would not have been appropriate to reimburse an employee for gas or mileage incurred while travelling in another company's car.  (Id. at 68:11–25.)

Prior to September 15, 2015, Marquet-Sandt had, on approximately six occasions, traveled to marketing events in the same car as an employee from Sight & Sound, which often partnered in Shady Maple's marketing efforts.  (Id. at 25:11–21, 26:5–14.)  On one occasion, Marquet-Sandt took her own car on one of these joint trips, but most of the time she rode in a Sight & Sound vehicle.  (Id. at 26:15–23.)  Marquet-Sandt could recall actually driving a Sight & Sound vehicle on only one other occasion prior to the accident in question.  (Id. at 27:4–22.)

On the day of the accident, a Sight & Sound employee, William Luckenbaugh, planned to use the Sight & Sound Yukon to travel to a trade show in Saratoga Springs, New York for purposes of marketing Sight & Sound's business.  (8/10 Stip. ¶ 39.)  Marquet-Sandt was travelling to the same show in order to promote Shady Maple business.  (Id. ¶ 12.)  Luckenbaugh called Marquet-Sandt and suggested they ride together.  (Trial Tr. 29:16–21.)  Marquet-Sandt then reached out to her supervisor, John Gehr, who approved the trip.  (Id. at 29:20–22.)  Luckenbaugh packed the Yukon—which displayed a Sight & Sound decal—with Sight & Sound brochures and a fifty-five inch television he planned to use at the trade show.  (Dep. of William Luckenbaugh ("Luckenbaugh Dep.") 8:6–9, 15:23–16:7.)[3]

---

[3]     Although Continental stipulated to the admission of William Luckenbaugh's deposition testimony, it has objected to one portion of that testimony on page eleven of the transcript.  It now moves to strike that portion.  As I do not rely on that testimony in rendering my decision, I will deny the Motion as moot.

That morning, Marquet-Sandt drove her 2011 Honda Accord to a parking lot to meet Luckenbaugh.  (Trial Tr. 42:11–19.)  She brought with her some Shady Maple promotional materials, including some rolled up banners and a small box of "stuff" for the trade show, which she put in the Yukon.  (Id. at 42:20–43:11; Luckenbaugh Dep. 16:8–14.)  In a "spur-of-the-moment" decision made that morning, Marquet-Sandt offered to drive the Yukon because Luckenbaugh was older and she wanted to help him.  (Trial Tr. 43:21–44:3.)  Luckenbaugh agreed and got into the passenger seat, while Marquet-Sandt took the driver's seat.  (Id. at 30:23–31:12.) Marquet-Sandt then put her Garmin GPS onto the windshield of the car in order to get directions, even though she knew where she was going for a substantial portion of the trip.  (Id. at 32:18–23.)

Marquet-Sandt had been driving for about an hour and a half prior to the accident.  (Id. at 36:3–5.)  Luckenbaugh needed to use the bathroom and asked Marquet-Sandt to stop at a nearby McDonald's.  (Id. at 47:10–48:6.)  After that break, Luckenbaugh had intended to "switch spots" with Marquet-Sandt and take over driving.  (Luckenbaugh Dep. 16:22–24.)  Marquet-Sandt, however, missed the exit for the McDonald's and, while attempting to turn around, she hit a motorcycle ridden by Jeremy Esakoff, the plaintiff in the underlying personal injury suit. (Trial Tr. 36:13–21.)

Shortly after the accident, Marquet-Sandt spoke with her supervisor John Gehr, who did not question or reprimand her for driving the Yukon.  (Id. at 36:22–37:17.)  Indeed, at no time prior to the accident did Shady Maple ever tell Marquet-Sandt that she was not allowed to drive a Sight & Sound vehicle.[4]  (8/10 Stip. ¶ 20.)

---

[4]     I noted that, at the end of 2017, Marquet-Sandt was directed to take a company van on future business travel.  (Id. ¶ 22.)

### B.   The *Esakoff* Action and Insurance Coverage

Esakoff filed suit in the Philadelphia County Court of Common Pleas (the "Esakoff Action"), naming nineteen defendants, including Marquet-Sandt, Sight & Sound, and other entities affiliated with both Sight & Sound and Shady Maple. (Id. ¶ 23) The Esakoff Action amended complaint alleged that the accident was caused by Marquet-Sandt's negligence, and that the remaining defendants were vicariously liable. (Id. ¶ 24.)

Sight & Sound's Yukon was scheduled on and subject to the terms of a policy issued by Great American Insurance Company ("GAIC"). [5] (Id. ¶ 37.) Plaintiff Continental issued a commercial umbrella policy to Sight & Sound that provided coverage above the designated coverage amounts in the GAIC policy. (Id. ¶ 30.)

Defendant Penn National had issued a business automobile policy to Shady Maple ("Penn National Primary Policy"). (9/17 Stip. ¶ 1.) In connection with the Primary Policy, Penn National provided a defense to Shady Maple in the Esakoff Action. (8/10 Stip. ¶ 26.) That Primary Policy provided, in pertinent part, as follows:

> A.   Coverage
> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership maintenance or use of a covered "auto."

(Pl.'s Ex. 5.) A "covered 'auto'" as defined in the Penn National Primary Policy, as "Any 'Auto.'"

The Penn National Primary Policy then set forth "Who Is An Insured":

> The following are "insureds":

> a.  You [Shady Maple] for any covered "auto".

---

[5]     Penn National submitted, as an exhibit to its post-trial briefing, the GAIC policy. Continental has moved to strike this exhibit based on my ruling, at the close of trial testimony, that this policy was not relevant. While I will not consider the substance of the GAIC policy, the parties have nonetheless stipulated that Sight & Sound's Yukon was subject to the terms of the GAIC policy issued to Sight & Sound and in effect at the time of the accident. (8/10 Stip. ¶ 37.)

> b.  Anyone else while using with your [Shady Maple's] permission a covered "auto" you own, hire or borrow except:
>
> > (1)   The owner or anyone else from whom you hire or borrow a covered "auto"
> > . . .
> > (2) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household . . .

(Id.)

Penn National also issued a Commercial Umbrella Policy to Shady Maple with limits of $10 million excess of the Penn National Primary Policy (the "Penn National Excess Policy"). (Pl.'s Ex. 6.)  As with the Penn National Primary Policy, the Excess Policy provided:

> **Section II – WHO IS AN INSURED**
> . . .
> **2.**      Only with respect to liability arising out of the ownership, maintenance or use of "covered autos":
> **a.**      You are an insured.
> **b.**      Anyone else while using with your permission a "covered auto" you own, hire or borrow is also an insured except:
> > (1)      The owner or anyone else from whom you hire or borrow a "covered auto" . . .
> > . . .
> > (2) Your "employee" if the "covered auto" is owned by that "employee" or a member of his or her household.

(Pl.'s Ex. 6.)

On November 1, 2017, the Esakoff Action was settled at a private mediation for $10 million (the "Esakoff settlement").  Continental participated in the mediation and contributed $8.7 million to the settlement, while GAIC contributed $1 million and Erie Insurance Exchange contributed $300,000.

On September 19, 2017, Continental brought this lawsuit against Penn National seeking a declaratory judgment that the Penn National Primary and Excess Policies should have responded to any indemnity obligation (by way of settlement or judgment) in the Esakoff Action before the

Continental Excess Policy was called upon to respond.   Alternatively, Continental seeks a declaration that said policies should have responded on an equal basis.

The parties proceeded to a bench trial on the sole issue of whether the Penn National Primary and Excess Policies were triggered by Marquet-Sandt's operation of the vehicle.   The main issue at trial was whether Shady Maple, through the actions of Marquet-Sandt within the course and scope of her employment, "borrowed" the Sight and Sound vehicle.

## II.   LEGAL CONCLUSIONS

As noted above, this case involves a claim for equitable contribution by Continental against Penn National.   To recover on a claim of equitable contribution under Pennsylvania law, an insurer must show by a preponderance of the evidence that (1) it is one of several parties liable for a common debt or obligation; and (2) it discharged the debt for the benefit of the other parties." Great Northern Ins. Co. v. Greenwich Ins. Co., 372 F. App'x 253, 254 (3d Cir. 2010) (citing In re Mellon's Estate, 32 A.2d 749, 757 (Pa. 1943)).   The first factor is at issue here.

Resolution of this issue requires a determination of whether Penn National's policy was triggered by the facts surrounding use of the Yukon and the resulting accident, thus rendering it liable for at least part of the Esakoff Settlement.   "Under Pennsylvania law, 'the interpretation of a contract of insurance is a matter of law for the courts to decide.'" Allstate Prop. & Cas. Ins. Co. v. Squires, 667 F.3d 388, 390–91 (3d Cir. 2012) (quoting Paylor v. Hartford Ins. Co., 640 A.2d 1234, 1235 (Pa. 1994)).   The court must ascertain the intent of the parties from the language of the policy.   Id.   When the policy language is clear and unambiguous, the court will give effect to that language.   Id.   "Ambiguity exists if the contract language is 'reasonably susceptible of different constructions and capable of being understood in more than one sense.'"   Whitmore v. Liberty

Mut. Fire Ins. Co., No. 07-5162, 2008 WL 4425227, at *3 (E.D. Pa. Sep. 30, 2008) (quoting

Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)).

As noted above, the Penn National Primary Policy provides liability coverage, in pertinent

part, for a use by an "insured" for a "covered 'auto'." An "insured" includes "[a]nyone else while

using with your permission a covered 'auto' you own, hire or borrow except: . . . [t]he owner or

anyone else from whom you hire or borrow a covered 'auto'." (9/17 Stip. ¶¶ (a)(1), (a)(2).) Thus,

the Penn National Primary Policy covers Shady Maple's vicarious liability for Marquet-Sandt's

negligence only if Marquet-Sandt, acting with Shady Maple's permission, "borrowed" the Yukon.

The parties dispute the proper interpretation of the term "borrow" as used in the Policies at issue

and whether, under the facts of this case, Marquet-Sandt borrowed the Yukon.

Although the dispute turns on the definition of the term "borrow," the policy does not

define this term, and it is not a technical insurance term with a strict legal meaning. See generally

Hanneman v. Cont'l Western Ins. Co., 575 N.W.2d 445, 451 (N.D. 1998) (noting that "borrow"

has no strict legal meaning in the insurance context); State Farm Fire & Cas. Co. v. Am. Hardware

Mut. Ins. Co., 482 S.E.2d 714, 717 (Ga. 1997) (noting that "borrow" does not have a technical or

unique meaning). Thus, I must look outside the four corners of the contract in order to determine

the meaning of "borrow."

Turning to the plain meaning of this term, I note that dictionary definitions provide little

guidance in the context of the dispute before me. Webster's Dictionary defines "borrow" to mean

"to take from another by request and consent, with a view to return the thing taken and return it or

its equivalent." Northland Ins. Co. v. Lincoln Gen. Ins. Co., 153 F. App'x 93, 97 n.3 (3d Cir.

2005) (quoting Webster's New Universal Unabridged Dictionary, 211 (2d ed. 1983)). Merriam-

Webster defines "borrow" to mean "to receive with the implied or expressed intention of returning

8

the same or an equivalent," while Black's Law Dictionary defines "borrow" as "tak[ing] something for temporary use."   <u>Olson v. State Auto Prop. & Cas. Ins. Co.</u>, No. 737-WDA-2019, 2020 WL 1042636 (Pa. Super. Mar. 3, 2020) (quoting <u>Merriam Webster's Collegiate Dictionary</u> 144 (11th ed. 2003) and (<u>Black's Law Dictionary</u> 196 (8th ed. 2004)).

As I noted in my summary judgment opinion, the Pennsylvania Supreme Court has yet to opine on the scope of this term, and various states' cases offer inconsistent interpretations of its meaning as used in the context of an automobile insurance policy.  <u>See</u> <u>Continental Cas. Co. v. Pa. Mut. Cas. Ins. Co.</u>, 390 F. Supp. 2d 614, 616 (E.D. Pa. 2019).  Given the dearth of Pennsylvania jurisprudence on this issue, I seek guidance from other states.

One line of cases holds that an employer "borrows" a vehicle when it temporarily gains the use of a third party's vehicle for its purposes.  For example, in <u>Travelers Indemnity Co. v. Swearinger</u>, 169 Cal. App.3d 779 (Cal. Ct. App. 1985), the California Court of Appeals considered the meaning of the term "borrow" in an automobile insurance policy.  In that matter, a school annually hosted a group of visiting pupils, who stayed with a "host" family.  The school district secured transportation for those pupils to and from school events through the host families' use of their own cars.  <u>Id.</u> at 786.  The accident in question occurred while one of the host families was driving a visiting pupil to the school in its own car, but for the school's purposes.  <u>Id.</u> at 786.  The court found that an entity, which can only operate through individuals, "can borrow a vehicle whenever it properly gains the use of a third party's vehicle for its purposes whatever may be said of the employee's dominion over the vehicle (by ownership) or physical possession of it (by driving it)."  <u>Id.</u> at 785.  The court remarked that it is not the chattel itself which is of concern to the insurance company, but rather "the injurious consequences of the use of the vehicle which it is the purpose of the policy to indemnify."  <u>Id.</u>  This interpretation invoked one of the definitions of

"borrow" in the Oxford English Dictionary, "to make temporary use of something not one's own."
Id.  Applying this definition to the facts before it, the California court held that the school district
had "borrowed" the host family's car.  Id. at 786.

Similarly, in Andresen v. Employers Mut. Cas. Co., 461 N.W.2d 181 (Iowa 1990), the
Iowa Supreme Court considered the meaning of the term "borrow" in an almost identical
automobile insurance policy and adopted the definition from Swearinger.  In Andresen, the
plaintiff, had been employed by First Bank to shovel snow at a property owned by the bank.  Id.
at 182.  Although the bank ordinarily furnished the plaintiff with one of its vehicles, no vehicles
were available on the day in question, and the plaintiff was directed to use his own.  Id.  The bank
agreed that whenever the plaintiff used his own car on bank business, it would pay him a certain
amount per mile driven.  Id. at 182–83.  While performing bank duties with his own automobile,
the plaintiff was seriously injured in a car collision caused by another driver.  Id. at 183.  The
plaintiff sought to recover under the bank's underinsured motorist coverage, but the insurance
company argued that his auto was not "borrowed" because the auto never left its owner's (the
plaintiff's) possession.  Id.  The Iowa Supreme Court rejected this argument, holding that "a
vehicle is borrowed when someone other than the owner temporarily gains its use."  Id. at 185.  It
found that the bank "temporarily gained the use of Andresen's vehicle as a substitute for its own,
regardless of the fact that Andresen himself—as a bank employee—drove the car on the bank's
business."  Id.

Swearinger and Andresen, however, have been deemed the "minority" view, and another
line of cases on the term "borrow" offers an expanded, more widely accepted definition of the
term.[6]  See Selective Ins. Co. of S. Carolina v. Sullivan, 694 F. App'x 379, 384 (6th Cir. 2017)

---

[6]     Indeed, even California courts have rejected Swearinger's definition of "borrow."  See
Am. Int'l Underwriters Ins. Co. v. Am. Guarantee & Liab. Ins. Co., 105 Cal. Rptr.3d 64, 73–74

(holding that the <u>Swearinger</u> definition of "borrow" is a minority view).  Under this expanded definition, "borrow" has been construed to mean more than merely receiving some benefit from another's use of a third person's vehicle.  Rather, the "majority view" holds that "borrowing" a car also "requires possession reflecting dominion and control over the vehicle."  <u>Schroeder v. Bd. of Supervisors of La. State Univ.</u>, 591 So.2d 342, 347 (La. 1991).

      <u>Schroeder v. Board of Supervisors of Louisiana State University</u> most clearly articulates this "majority" view.  In <u>Schroeder</u>, a high school student, Eric, drove his father's car to University Laboratory School on the Louisiana State University ("LSU") campus, where he attended high school.  <u>Id.</u> at 344.  On the way, Eric picked up a classmate, Brad, and purchased a six-pack of beer, which they consumed in the parking lot.  <u>Id.</u>  The boys arrived at school around 12:30 p.m. to participate in school-sponsored and chaperoned events.  <u>Id.</u>  Later that afternoon, a faculty sponsor asked if Brad would pick up ice and gave him money for the purchase.  <u>Id.</u>  Without the sponsor's knowledge, Brad asked Eric to drive him to get the ice and, on the way back, Eric collided with another car.  <u>Id.</u>  Eric's family filed suit against LSU and its insurers seeking coverage on the basis that LSU was vicariously responsible for the tortious conduct of Eric, and that Eric was an insured under LSU's policy.  <u>Id.</u>  The Louisiana Supreme Court rejected the interpretation of "borrow" espoused in <u>Swearinger</u> and concluded that "[t]he evidence adduced in support of [] summary judgment does not establish beyond genuine dispute that LSU acquired or exercised possession, dominion, control, or even the right to direct the use of the vehicle in question" even though the students were using the vehicle for the school activities.  <u>Id.</u> at 347.  The court declined

---

(Cal. App. 1985) (declining to adopt the <u>Swearinger</u> version of "borrow" and instead relying on the definition set forth in <u>Schroeder</u>); <u>City of Los Angeles v. Allianz Ins. Co.</u>, 22 Cal. Rptr.3d 716, 723 (Cal. App. 2004) (distinguishing <u>Swearinger</u> and finding that "borrowing" requires the exercise of "dominion and control.")

to affix liability to LSU or its insurer despite the fact that LSU "may have benefitted from its use by the students."  Id.

Similarly, in Atlantic Mutual Ins. Co. v. Palisades Safety & Ins. Co., No. A-3608-01T1, 2003 WL 22100231 (N.J. Super. July 22, 2003), the New Jersey Superior Court faced the question of whether an insured was a "borrower" for purposes of an automobile insurance policy.  Id. at *1. In that matter, Cedar Johnson was operating his wife's vehicle when he struck another car.  Id.  At the time of the accident, Johnson and his passenger, Daniel LaVienna, were employed by Cambridge Frozen Bakery Products ("Cambridge") and were returning from the home of Cambridge's president, Majewski, who had sent them to retrieve his prescription medicine.  Id. Neither man had "punched out," and both remained "on the clock," and therefore were working for Cambridge during the trip.  Id.  When the victim sued the Johnsons, Cambridge, and Majewski for negligence, Cambridge's insurance company denied coverage, arguing that Majewski was not an insured under the policy because he did not "borrow" the car with Cambridge's permission.  Id. The New Jersey Superior Court disagreed, finding that a person becomes a borrower when he or she "assume[s] a certain amount of control, dominion or power over the object being borrowed" and where the "user" of the vehicle has "simultaneous authority to move the vehicle" in order to be considered a "borrower."  Id. at *2–3.  Under that definition, the court concluded that Johnson's auto was "borrowed" by Cambridge because Cambridge's use of its employee's automobiles was a "daily occurrence," Johnson admitted that he believed that the performance of these tasks was a part of his job, and the employees remained "on the clock" and "receiv[ed] pay" when running these errands.  Id. at *3.[7]

---

[7]     More recently—and since I issued my Opinion on cross-motions for summary judgment— the Pennsylvania Superior commented, albeit with little guidance, on the definition of the term "borrowed."  Olson v. State Auto Prop. & Cas. Ins. Co., 737-WDA-2019, 2020 WL 1042636 (Pa. Super. Mar. 3, 2020).  In Olson, Michael Sayre, Jr. was operating his own motor vehicle in the

In my Memorandum Opinion regarding the parties' Cross-motions for Summary Judgment, I adopted the "majority" view of the term "borrow" as used in an insurance policy. Cont'l Cas. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 390 F. Supp. 3d 614, 628 (E.D. Pa. 2019).  This definition necessitates the exercise of dominion and control together with the simultaneous authority to move the vehicle.  Requiring this type of substantial possession and control over the vehicle requires more than simply receiving the benefit of the item; it "implies that when something is borrowed, the borrower assumes control of the object."  Reliance Ins. Co. v. Lexington Ins. Co., 361 S.E.2d 403, 433 (N.C. Ct. App. 1987) (citing F&M Schaefer Brewing v. Forbes Food Div., 376 A.2d 1282 (N.J. Super. 1977)).  After another review of the available case law on the definition of "borrow," I stand by my original conclusion and will continue to apply the majority view.

---

course of his employment with his company, International Titanium Corp. ("International"), for the purpose of picking up the company's mail, when he struck a car in which Donna Olson was a passenger. Id. at *1. Olson sought a declaratory judgment against State Auto Property & Casualty Insurance Company ("State Auto"), who insured International, alleging that Sayre should be covered under the policy.  Id.  Pertinent policy language provided that for coverage to attach, Sayre's vehicle had to qualify as a "covered auto" and Sayre must have been an "insured" at the time of the accident. Id. at *3.  A "covered auto" included, among other non-relevant categories, any auto not owned, leased, or borrowed by International that is used in connection with its business. Id.  An "insured" was "[a]nyone else while using with your permission a covered 'auto' you own,  hire or borrow except . . . [y]our employee if the covered 'auto' is owned by that employee or a member of his or her household." Id.

The Pennsylvania Superior Court framed the key issue as: "whether Sayre's vehicle qualifie[d] as a 'covered auto,' and whether Sayre himself [was] an 'insured,' depends upon whether, at the time of the accident, [the company] 'borrowed' his vehicle."  Id.  Citing to several of the cases referenced above, the Superior Court found it "relatively clear that, at the time of the accident, International temporarily utilized Sayre's vehicle with the implied intention of returning it" and, thus, "borrowed" Sayre's car. Id.  Notably, the Pennsylvania Superior Court did not clarify what standard should be applied in determining whether a car is "borrowed" for purposes of an insurance policy.  In fact, it cited with approval both the minority view cases of Andresen and Swearinger and the majority view case of Atlantic Mutual without acknowledging the distinction in the standards applied by each.

But having adopted the majority view does not squarely resolve this matter because none of the majority view precedent addresses the precise factual situation at issue here. Both <u>Schroeder</u> and <u>Atlantic Mutual</u> involved facts where the vehicle was used exclusively for the use of the borrower with no tangible benefit to the owner. Here, by contrast, Mr. Luckenbaugh—acting as an employee of vehicle owner Sight & Sound—remained in the vehicle at all times and continued to receive a benefit.

Two instructive cases from outside of Pennsylvania—both of which adopted the majority view—have addressed analogous facts. First, in <u>Hanneman v. Cont'l Western Ins. Co.</u>, 575 N.W.2d 445 (N.D. 1998), friends, Hanneman and Kurry, drove together to a street party in Hanneman's car. <u>Id.</u> at 447. On the way home, Kurry, acting as designated driver in Hanneman's car, lost control and flipped the car, resulting in Hanneman's death. <u>Id.</u> Hanneman's family sued Kurry's insurance carrier, arguing, under almost identical insurance language, that Kurry had "borrowed" Hanneman's car. <u>Id.</u> Using the "substantial possession and control over the vehicle" definition of "borrowed," the Supreme Court of North Dakota found that Kurry's status as a "designated driver" did not fit within the ordinary meaning of the contract term, "borrow." <u>Id.</u> at 451–52. The court remarked that even though Kurry received the benefit of getting a ride to the party and exercised control by speeding and installing her own "fuzz buster" (*i.e.*, radar detector), "[b]orrowing requires more than an incidental benefit to the purported borrower, more than the existence of imprudent decisions, and more than unsafe driving." <u>Id.</u> at 452. The court observed that Hanneman directed control of the vehicle, determined that Kurry would be the driver, and remained a passenger in the car throughout the trip, thus retaining possession and control. <u>Id.</u> Ultimately, the court concluded that "[e]ven with Kurry behind the wheel . . . Hanneman remained

in possession and control of the vehicle" and, thus, Kurry did not "borrow" Hanneman's car for her own use.  Id.

Similarly, in NGM Insurance Company v. Pillsbury, 416 F. Supp. 3d 57 (D. Mass. 2019), T. Mansfield, was driving home from a wedding in a car owned by his wife, J. Mansfield, while his wife was a passenger in the car.  Id. at 60.  The car struck and injured a motorcyclist.  Id. at 60. Acknowledging the varying definitions of "borrow," the Massachusetts federal court declined "to determine whether the standard and ordinary meaning of the term 'borrow' includes the right to retain dominion and control."  Id. at 65.  Rather, the court found that "under any of the definitions which courts have adopted, M. Pillsbury did not 'borrow' his wife's car."  Id.  "More specifically, M. Pillsbury never 'received' his wife's car with an intent to return it because she never relinquished the vehicle to him.'"  Id.  In turn, the court determined that M. Pillsbury's insurance company had no duty to defend. [8]  Id.

---

[8]       To counter these cases, Continental relies heavily on the Pennsylvania federal court case of Great West Casualty Company v. Selective Insurance Company, No. 16-383, 2017 WL 4386817 (W.D. Pa. Sept. 28, 2017) for the proposition that Pennsylvania has adopted a broader definition of "borrow."  In that case, a man was killed when the rear wheels of a trailer owned by Midwest, being hauled by Veltri Trucking, and being driven by Veltri's employee, traveled across the median striking another vehicle.  Id. at *2.  Midwest's insurance company demanded that Veltri's insurance company defend it in the underlying lawsuit.  Id. at *3.  Recognizing that the duty to defend is broad and triggered by the allegations in the underlying complaint, the court found that "it is possible that, on the date of the accident, Veltri Trucking 'borrow[ed] the Midwest Trailer from Midwest in that based upon [the allegations in the underlying complaint] one could conclude that one that date, Veltri Trucking had taken temporary possession and use of the Midwest Trailer from Midwest for its own purposes through some express or implied permissive arrangement with Midwest."  Id. at *11.
        I find this case inapposite.  Unlike the present case, the ruling in Great Western was made in the course of determining whether there was a duty to defend, which is triggered whenever allegations in the underlying complaint "could potentially fall" within the coverage of the policy. Id. at *9.  The court did not definitively rule that Veltri had "borrowed" the Midwest trailer. Moreover, unlike the present case where Sight & Sound remained in control over the vehicle, Midwest had completely surrendered all control over the trailer to Veltri.  Finally, the Great West court cited, with approval, the majority definition of "borrow" meaning "acquisition of temporary possession, dominion or control of a thing, or the right to direct the use of a thing, not merely the receipt of some benefit from its use by another person."  Id. at *10.

Considering the facts of the present case in conjunction with the precedent detailed above, I find that Shady Maple, acting through its employee Marquet-Sandt, never acquired control, dominion, or possession over the Yukon such that Shady Maple can be deemed to have "borrowed" that vehicle for purposes of triggering the Penn National Primary and Excess Policies. As noted above, Luckenbaugh had already planned to use the Yukon, owned by his employer, to travel to a trade show in Saratoga Springs, New York for purposes of marketing Sight & Sound's business. (8/10 Stip. ¶ 39.) Prior to meeting Luckenbaugh, Marquet-Sandt, who was attending the same trade show, never attempted to make affirmative arrangements to borrow the Yukon. Rather, it was Luckenbaugh who called Marquet-Sandt and suggested they ride together. (Trial Tr. 29:16–21.) The Yukon's decal clearly advertised Sight & Sound, and Luckenbaugh packed the vehicle with multiple Sight & Sound marketing items and a fifty-five inch television, all of which are facts that cut against Maqrquet-Sandt having control over the vehicle. (Luckenbaugh Dep. 8:6–9, 15:23–16:7.)

When Luckenbaugh and Marquet-Sandt met at the parking lot, the original understanding between the two was that Luckenbaugh would be driving and that Marquet-Sandt would remain a passenger. But in a spur-of-the-moment decision, Marquet-Sandt offered to drive the Yukon and Luckenbaugh agreed. This offer was not based on any effort by Marquet-Sandt to exercise control over the car or to use it for her own or Shady Maple's purposes. Rather, Marquet-Sandt was motivated solely by the altruistic desire to help Luckenbaugh because he was older and the drive was long. (Trial Tr. 43:21–44:3.)

During the trip, Marquet-Sandt believed, as any driver would, that she could unilaterally make basic driving decisions such as which lane to travel in, whether to use the turn signal, what speed to travel, and when to apply the brakes. (Trial Tr. 34:12–35:15.) But aside from those basic

16

driving decisions that must naturally be left to the person driving the vehicle, Marquet-Sandt did not believe that she had the right to control the vehicle in any manner other than how Luckenbaugh directed because "it was his car."  (Trial Tr. 49:15–19.)   Marquet-Sandt understood that Luckenbaugh had the right, at any time, to tell her to stop driving or to take over driving the vehicle. (Id. at 50:3–20.)   Indeed, just prior to the accident, Luckenbaugh directed her to pull off at a McDonald's, and he planned to take over driving after that.  (Trial Tr. 36:3–5, 47:10–48:6; Luckenbaugh Dep. 16:22–24.)

Notably, Marquet-Sandt testified that, on the day of the accident, she did not have express authority from Shady Maple to borrow a vehicle, and no one at Shady Maple knew that she had ever driven anyone else's vehicle on Shady Maple's business.  (Trial Tr. 39:16–41:19.)  Marquet-Sandt stated that she had not told anyone at Shady Maple that she was going to be travelling in the Yukon.  (Id.)  Although Marquet-Sandt could have used her own car for business travel and gotten reimbursed for gas, mileage and tolls, (Trial Tr. 23:21–24:3, 61:15–15), Shady Maple would not have reimbursed her or Sight & Sound for gas and mileage incurred with use of the Yukon.  (Trial Tr. 68:11–25.)

Considering all of these facts, I find that Marquet-Sandt's simple act of taking over the driving for a portion of a trip to a trade show on Shady Maple business does not equate to Shady Maple "borrowing" Sight & Sound's car.  Even though Marquet-Sandt received the benefit of getting a ride to the trade show and physically drove the car,[9] "[b]orrowing requires more than an

---

[9]    Continental cites to Smalich v. Westfall, 269 A.2d 476, 483 (Pa. 1970) to argue that it is the driver who has control over the operation of the vehicle and the owner's mere presence does not create any presumption of control.  Smalich, however, actually supports a finding that Shady Maple, through Marquet-Sandt, did not "borrow" the Yukon.

Smalich arose in the context of a contributory negligence action following a car accident and did not discuss the meaning of the term "borrow" as used in an insurance policy.  The Pennsylvania Supreme Court acknowledged that, "[w]e have serious doubt that, in the ordinary situation, the mutual understanding of the owner-passenger and the driver is that the owner-

incidental benefit to the purported borrower, more than the existence of imprudent decisions, and more than unsafe driving." <u>Hanneman</u>, 575 N.W.2d at 452.  Luckenbaugh, on behalf of Sight & Sound, determined where they would be going, decided when they needed to stop, and intended to take over driving after stopping at the McDonald's.  The Yukon displayed advertising for Sight & Sound and, at the time of the accident, was carrying Sight & Sound materials needed for the trade show.  Luckenbaugh remained in the car at all times and testified that, if Marquet-Sandt had driven separately in her vehicle, he still would have driven the Yukon to the trade show.  Ultimately, even though Marquet-Sandt was physically behind the wheel of the car, Luckenbaugh—and by extension, Sight & Sound—remained in possession and control of the vehicle.  Accordingly, I do not find that Shady Maple, acting through Marquet-Sandt, borrowed the Yukon.

As Shady Maple did not "borrow" the car, neither the Penn National Primary Policy nor the Penn National Excess Policy was triggered, meaning that Penn National owed no defense or coverage in the underlying <u>Esakoff</u> action.  In turn, Plaintiff Continental is not entitled to equitable contribution from Penn National for any amounts it paid in connection with the settlement of the <u>Esakoff</u> action.  Accordingly, I will grant judgment in favor of Defendant and against Plaintiff.

---

passenger reserves a right to control over the physical details of driving or that the driver consents to submit himself to the control of a 'back-seat driver.'" <u>Id.</u> at 481.  The Court went on to remark, however, that "[i]t seems more reasonable that the mutual understanding is that the driver will use case and skill to accomplish a result, retaining control over the manner of operation yet subject to the duty of obedience to the wishes of the owner-passenger as to such things as destination." <u>Id.</u> at 482.  The Court further clarified that, "[w]e do not mean . . . that the presence of the owner is entirely irrelevant, or that there is no legal significance that an owner present in his car has the power to control it." <u>Id.</u>