IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CONTINENTAL CASUALTY COMPANY,** : | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| v. | : | No. 17-4183 |
| **PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY,** | : : | |
| **Defendant.** | : : | |

**Goldberg, J.**                                                                                           **December 14, 2021**

# MEMORANDUM OPINION

This Declaratory Judgment action involves a dispute between two insurers stemming from a significant personal injury settlement. Plaintiff Continental Casualty Company ("Continental"), having paid the majority of the settlement, has sued Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") seeking equitable contribution.

On September 24, 2020, I presided over a bench trial on the limited issue of whether Penn National's insured "borrowed" the vehicle involved in the accident, which would trigger Penn National's coverage of the driver under the Penn National insurance policies. On March 12, 2021, I concluded that Penn National's insured did not "borrow" the vehicle and therefore granted judgment in favor of Defendant Penn National and against Plaintiff Continental.

Continental now seeks to alter or amend judgment arguing that I rendered judgment without resolving all potential bases for Penn National's liability. Continental's motion does not challenge my ruling that Penn National's insured did not "borrow" the vehicle at issue. Rather,

Continental contends that this ruling was not dispositive of the entire coverage issue and that Penn National's coverage obligations to its insured existed independently of the "borrowing" question.

For the following reasons, I will grant the Motion in part, amend my March 12, 2021 Memorandum Opinion and Order, and re-enter judgment in favor of Penn National and against Continental.

I.      **FACTUAL BACKGROUND**

   A.      **The Accident**

The facts of the accident in question are set forth in my Findings of Fact and Conclusions of Law:

> On September 15, 2015, Jeremy Esakoff was operating a motorcycle in Reading Township, New Jersey, that was struck by a GMC Yukon (the "Yukon") operated by Kathryn Marquet-Sandt. At the time of the accident, Marquet-Sandt was employed by Shady Maple Smorgasboard, Inc. ("Shady Maple") and was driving the Yukon to attend a work-related marketing event. The Yukon was owned by Sight & Sound Ministries, Inc. ("Sight & Sound"). As a result of the accident, Mr. Esakoff sustained significant injuries.
>
> Marquet-Sandt had been an employee of Shady Maple for about seven years, and held the title of "Group and Event Sales." In the scope of that position, and in order to promote business for Shady Maple, Marquet-Sandt travelled on day trips three to four times a week, and on overnight trips every two to three months. She recalled travelling approximately 120 miles per week. In September of 2015, the month of the accident, Shady Maple did not have a policy in place regarding what car Marquet-Sandt was supposed to use for company travel. Shady Maple would reimburse Marquet-Sandt for her travel, including her mileage and other expenses. The Chief Human Resources Officer for Shady Maple, Diane Adamczyk, testified that it would not have been appropriate to reimburse an employee for gas or mileage incurred while travelling in another company's car.
>
> Prior to September 15, 2015, Marquet-Sandt had, on approximately six occasions, traveled to marketing events in the same car as an employee from Sight & Sound, which often partnered in Shady Maple's marketing efforts. On one occasion, Marquet-

Sandt took her own car on one of these joint trips, but most of the time she rode in a Sight & Sound vehicle. Marquet-Sandt could recall actually driving a Sight & Sound vehicle on only one other occasion prior to the accident in question.

On the day of the accident, a Sight & Sound employee, William Luckenbaugh, planned to use the Sight & Sound Yukon to travel to a trade show in Saratoga Springs, New York for purposes of marketing Sight & Sound's business. Marquet-Sandt was travelling to the same show in order to promote Shady Maple business. Luckenbaugh called Marquet-Sandt and suggested they ride together. Marquet-Sandt then reached out to her supervisor, John Gehr, who approved the trip. Luckenbaugh packed the Yukon—which displayed a Sight & Sound decal—with Sight & Sound brochures and a fifty-five inch television he planned to use at the trade show.

That morning, Marquet-Sandt drove her 2011 Honda Accord to a parking lot to meet Luckenbaugh. She brought with her some Shady Maple promotional materials, including some rolled up banners and a small box of "stuff" for the trade show, which she put in the Yukon. In a "spur-of-the-moment" decision made that morning, Marquet-Sandt offered to drive the Yukon because Luckenbaugh was older and she wanted to help him. Luckenbaugh agreed and got into the passenger seat, while Marquet-Sandt took the driver's seat. Marquet-Sandt then put her Garmin GPS onto the windshield of the car in order to get directions, even though she knew where she was going for a substantial portion of the trip.

Marquet-Sandt had been driving for about an hour and a half prior to the accident. Luckenbaugh needed to use the bathroom and asked Marquet-Sandt to stop at a nearby McDonald's. After that break, Luckenbaugh had intended to "switch spots" with Marquet-Sandt and take over driving. Marquet-Sandt, however, missed the exit for the McDonald's and, while attempting to turn around, she hit a motorcycle ridden by Jeremy Esakoff, the plaintiff in the underlying personal injury suit.

Shortly after the accident, Marquet-Sandt spoke with her supervisor John Gehr, who did not question or reprimand her for driving the Yukon. Indeed, at no time prior to the accident did Shady Maple ever tell Marquet-Sandt that she was not allowed to drive a Sight & Sound vehicle.

3

Continental Cas. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 525 F. Supp. 3d 562, 563–65 (E.D. Pa. 2021) (footnotes and internal citations to record omitted).

### B. The State Court Lawsuit

As set forth in my Opinion on the parties' Cross-Motions for Summary Judgment, the following facts are undisputed by the parties:

> Esakoff [the victim in the accident] filed suit in the Philadelphia County Court of Common Pleas (the "Esakoff Action"), naming nineteen defendants, including Marquet-Sandt, SSMI, and other entities affiliated with both SSMI and Shady Maple. The amended complaint in that action alleged that the accident was caused by Marquet-Sandt's negligence, and that the remaining defendants were vicariously liable.
>
> Non-party Great American Insurance Company ("Great American") issued an insurance policy to a group of Sight & Sound entities ("Sight & Sound"), including SSMI [Sight & Sound Ministries, Inc.], in the amount of $1 million, and Great American agreed to provide a defense to Sight & Sound in the Esakoff Action. Plaintiff [Continental] issued a commercial umbrella policy to Sight & Sound that provided coverage above certain designated coverage amounts issued to Sight & Sound by Great American.
>
> Defendant Penn National issued a business automobile policy to Shady Maple. In connection with that policy, Penn National provided a defense to Shady Maple in the Esakoff Action. Penn National declined coverage for Marquet-Sandt pursuant to an understanding that Great American would provide Marquet-Sandt primary coverage.
>
> During the pendency of the Esakoff Action, various parties were dismissed from the case, leaving only the following defendants: Marquet-Sandt, Shady Maple Companies, Shady Maple Foundation, Shady Maple RV, Inc., Shady Maple Café, and SSMI. All of these defendants, except for SSMI, were Penn National insureds. [Continental] and Penn National disputed the priority of coverage. [Continental] asserted that Marquet-Sandt was acting in the scope of her employment for Shady Maple, which was an insured on Penn National's policies. Penn National claimed that its insured, Shady Maple, did not own, hire, or borrow the GMC Yukon and, therefore, it had no coverage obligations.

> On November 1, 2017, the Esakoff Action was settled at a private mediation for the sum of $10 million (the "Esakoff settlement"). [Continental] participated in the mediation and contributed $8.7 million to the settlement, while Great American contributed $1 million and Erie Insurance Exchange contributed $300,000.

Continental Cas. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 390 F. Supp. 3d 615, 618–19 (E.D. Pa. May 22, 2019).

### C. Procedural History

On September 19, 2017, Continental brought a declaratory judgment action against Penn National. The suit alleged that the Penn National Business Automobile Policy ("Penn National Primary Policy") and Penn National Excess Policy, issued to Shady Maple as named insured, should have responded to any indemnity obligation in the Esakoff Action before the Continental Commercial Umbrella Policy ("Continental Excess Policy"), issued to Sight & Sound, was called upon to respond. Alternatively, Continental sought a declaration that these policies should have responded on an equal basis.

Following resolution of cross-motions for summary judgment, a bench trial was held on the sole issue of whether the Penn National Primary and Excess Policies were triggered by Marquet-Sandt's operation of the vehicle. The main issue was whether Marquet-Sandt, acting in the course and scope of her employment with Shady Maple and with Shady Maple's permission, "borrowed" the Sight and Sound vehicle, therefore making her an "insured" under the Penn National insurance policies. On March 12, 2021, I found that Marquet-Sandt did not "borrow" the vehicle and granted judgment in favor of Defendant Penn National and against Plaintiff Continental.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(b) provides:

5

> **(b) Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. . . .

Fed. R. Civ. P. 52(b).

The primary purpose of a Rule 52(b) motion is to enable an appellate court to draw from the record a "correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and the judgment entered thereon." 9C Charles Wright & Arthur R. Miller, Federal Practice and Procedure § 2582 (3d 2017). A Rule 52(b) motion is not a vehicle for re-litigation of issues previously adjudicated.

> A party who failed to prove his strongest case is not entitled to a second opportunity to litigate a point, to present evidence that was available but not previously offered, or to advance new theories by moving to amend a particular finding of fact or a conclusion of law. It is said that the motion must raise questions of substance by seeking reconsideration of material findings of fact or conclusions of law *to prevent manifest injustice or reflect newly discovered evidence.*

Id. (emphasis added and footnotes omitted); see also Great Am. Ins. Co. v. Honeywell Int'l, Inc., No. 05–cv-857, 2009 WL 5064478, at *1 (W.D. Pa. Dec. 17, 2009) (citing Gutierrez v. Ashcroft, 289 F. Supp. 2d 555, 561 (D.N.J. 2003)).

A showing of such manifest injustice or newly discovered evidence is similar to the standards required of a Rule 59(e) motion. Wound Care Ctrs., Inc. v. Catalane, No. 10-cv-336, 2011 WL 3476612, at *2–3 (W.D. Pa. 2011). The United States Court of Appeals for the Third Circuit set forth the standard for Rule 59(e) motions:

> A proper motion to alter or amend judgment "must rely on one of three major grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; or (3) the need to correct clear error [of law] or prevent manifest injustice."

N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir.1995) (quotations omitted). In order to make modifications to findings of fact or conclusions of law, the challenged facts or conclusions must be "basic or essential." United States v. Crescent Amusement Co., 323 U.S. 173, 180 (1944).

"Because of the interest in finality, at least at the district court level, motions for reconsideration should be granted sparingly . . . . [A] motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already made, rightly or wrongly." Williams v. City of Pittsburgh, 32 F. Supp. 2d 236, 238 (W.D. Pa. 1998).

### III. DISCUSSION

As noted above, Continental asserts that judgment in favor of Penn National be revisited to consider other possible bases for liability on the part of Penn National. Crucial to understanding this current dispute is the language of the Penn National Policies. The Penn National Primary Policy, issued to Shady Maple as named insured, provided $1 million of liability coverage as set forth, in pertinent part, in the following provision:

> **A. Coverage**
> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership maintenance or use of a covered "auto."

(Compl., Ex. B; see also September 17, 2020 Stipulation, ¶ 1.) A "covered 'auto'" in this Policy means "Any 'Auto.'" (Compl., Ex. B.)

The Penn National Primary Policy then sets forth "Who Is An Insured":

> The following are "insureds":
>
> a. You for any covered "auto".:
>
> b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

7

> (1) The owner or anyone else from whom you hire or borrow a covered "auto".

(Id.)

The Penn National Excess Policy, also issued to Shady Maple as named insured, had a general aggregate coverage limit of $10 million. The "Coverages" section of this policy provided that Penn National would "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies." (Compl., Ex. C-1.)

In my March 12, 2021 Memorandum Opinion following trial, I found that Marquet-Sandt, acting in the course and scope of her employment with Shady Maple at the time of the accident, did not "borrow" the Yukon with Shady Maple's permission. As such, Marquet-Sandt did not qualify as an insured under subparagraph (b) of the "Who Is An Insured" provision of the Penn National policies. Continental now presses that while this "borrowing" issue resolves Penn National's coverage of Marquet-Sandt, it has no bearing on Penn National's coverage *of Shady Maple itself*, under subparagraph (a) of the "Who Is An Insured" provision. According to Continental, this subparagraph renders Shady Maple an insured for a "covered auto," which the policy defines as "any auto." Continental urges that, under a plain reading of subparagraph (a), Shady Maple is an insured under Penn National's policies for any auto, without qualification, including the Yukon used in the accident. As Shady Maple was a named defendant in the underlying Esakoff lawsuit, Continental asserts that Shady Maple was liable and, thus, should have been covered by the Penn National policy.

My March 21, 2021 Trial Memorandum Opinion does not address Continental's argument that Penn National's policy covers Shady Maple itself for "any auto," under subparagraph (a) of

"Who Is An Insured." But having now considered this issue, I disagree with Continental that any further factfinding or briefing is necessary.[1]

Prior to the bench trial, the parties submitted stipulations of fact, which resolved certain underlying facts that are important in determining Penn National's coverage obligations. Specifically, the parties stipulated to the following:

> At the time of the accident, Marquet-Sandt was working on behalf of her employer, Shady Maple. (Stipulations of Fact, ECF No. 85, ¶ 16.)
>
> The amended complaint in the *Esakoff* Action alleges that the defendants other than Marquet-Sandt "are derivatively and vicariously liable for the conduct" of Marquet-Sandt. (Id. ¶ 24.)
>
> The only claim or cause of action the Esakoffs asserted against defendants other than Marquet-Sandt was for vicarious liability for damages caused by the negligence of Marquet-Sandt. (Id. ¶ 25.)

Based on these stipulations, it is undisputed that Marquet-Sandt was the sole alleged active tortfeasor in the Esakoff Action and that Shady Maple was only alleged to be vicariously liable for Marquet-Sandt's actions taken within the scope of her employment.[2] Following the bench trial, I concluded that Marquet-Sandt was not herself an insured under the Penn National policy because she had not "borrowed" the Yukon on Shady Maple's behalf. Thus, the only remaining basis for

---

[1] Continental suggests that further proceedings are required to resolve these issues but also concedes that the issue of whether Continental is entitled to contribution from Penn National for the settlement paid on behalf of Shady Maple is a "legal issue." (Pl.'s Reply Br. 3.) As the parties have now stipulated to certain facts, I rely on both the summary judgment briefing and the briefing in connection with Continental's Motion to Alter and/or Amend Judgment to determine this remaining legal issue.

[2] Continental contends that there is no stipulation in the record that Marquet-Sandt was the sole active tortfeasor. (Pl.'s Reply Br. 4.) However, Continental did stipulate that the only claims raised in the Esakoff Action against defendants other than Marquet-Sandt were those of vicarious liability, which effectively establishes that the only claims of active negligence were raised solely against Marquet-Sandt.

imposing any contribution obligation on Penn National would be to find that its insured—Shady Maple—was liable on a vicarious liability theory and thus would have been held responsible for any judgment rendered in the Esakoff Action.

Penn National asserts that, even assuming that Shady Maple was held vicariously liable, then Shady Maple—and, in turn, Penn National—would have had a right to indemnification as a matter of law because Marquet-Sandt was the active tortfeasor ultimately liable for the accident. Thus, Penn National urges that, Continental, as Marquet-Sandt's sole insurer, would be liable for the entire amount of any judgment or settlement in the Esakoff Action.[3] Continental responds that no such indemnification claim by Shady Maple against Marquet-Sandt was pending at the time of the settlement. As such, according to Continental, when settlement occurred, Shady Maple was still vicariously liable, regardless of whether it could later pursue indemnification. In turn, Continental contends that Penn National, as Shady Maple's insurer, still had an obligation to pay for Shady's Maple's vicarious liability.

The parties have not cited—and I have not found—any cases that squarely address this issue in the precise context of an equitable contribution claim. Accordingly, in fashioning an appropriate equitable remedy, I will consider how equitable contribution principles, state law principles of vicarious liability, and state law principles of indemnity intersect.

Where more than one insurer has issued policies covering the same risk, a court of equity can exercise jurisdiction over the entire controversy to resolve the rights of all the interested parties, particularly where the issues between the insurers and the insured are

---

[3] On summary judgment, Penn National raised a similar argument, which the parties fully briefed. Bound by the record before me, I declined to accept this argument, finding that Shady Maple was an individually-named defendant in the Esakoff action, with no pending indemnity claim against Marquet-Sandt. Because some basic factual issues were not yet resolved, I could not conclude, as a matter of law, that Marquet-Sandt owed indemnity to Shady Maple, such that Penn National's obligations were eliminated.

similar. See 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 261s (5th ed.1941). "There is no bar [under Pennsylvania law] against an insurer obtaining a fair share of indemnification or defense costs from other insurers under 'other insurance' clauses or under the equitable doctrine of contribution." Manor Care, Inc. v. Continental Ins. Co., No. 01-cv-2524, 2003 WL 22436225, at *6 (E.D. Pa. Oct. 27, 2003) (quoting J.H. France Refractories v. Allstate Ins. Co., 626 A.2d 502, 509 (Pa. 1993)). "To recover on a claim of equitable contribution under Pennsylvania law, an insurer must show by a preponderance of the evidence that (1) it is one of several parties liable for a common debt or obligation; and (2) it discharged the debt for the benefit of the other parties." Great Northern Ins. Co. v. Greenwich Ins. Co., 372 F. App'x 253, 254 (3d Cir. 2010) (citing In re Mellon's Estate, 32 A.2d 749, 757 (Pa. 1943)).

In making equitable contribution decisions, a majority of jurisdictions recognize the principle that "[t]he respective obligations as between several insurers who have covered the same risk do not arise out of contract, but are based upon equitable principles designed to accomplish ultimate justice in the bearing of a specific burden." Gen. Acc. Ins. Co. of Am. v. Safety Nat'l Cas. Corp., 825 F. Supp. 705, 707 (E.D. Pa. 1993) (quoting Guaranty Nat'l Ins. Co. v. Am. Motorists Ins. Co., 758 F. Supp. 1394, 1397 (D. Mont. 1991), aff'd in part on other grounds, 981 F.2d 1108 (9th Cir. 1992)) (other citations omitted). "The equitable considerations that apply in a given case 'depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers.'" Id. (quotations omitted). "The controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another—the law abhors unjust enrichment." Maryland Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 212 (2d Cir. 2000). Stated differently, "[a] successful equitable contribution action therefore requires, at least,

a defendant that has an unsatisfied obligation to pay under its policy." Ins. Co. of Pennsylvania v. Great Northern Ins. Co., 787 F.3d 632 (1st Cir. 2015).

Balancing these equities here, I note that the parties are in agreement that Continental insured Marquet-Sandt and that Penn National insured her employer Shady Maple. It is further undisputed that Marquet-Sandt was the only party sued as an active tortfeasor and that Shady Maple was only sued as being vicariously liable under a *respondeat superior* theory, as Marquet-Sandt's employer. At the time of the settlement, both Marquet-Sandt and Shady Maple remained jointly liable, thereby triggering the coverage of both Continental and Penn National. As such, when the settlement was paid, Penn National, through its coverage of Shady Maple, was one of several parties that could have been liable for a common debt.

That determination alone, however, does not resolve the question of equitable contribution, *i.e.*, which insurer should pay the settlement amount. In ultimately resolving this dispute, I must consider the differing levels of liability among the parties—only Marquet-Sandt, as the driver of the vehicle, could have been actively liable, while Shady Maple was only vicariously liable. "Where an employer is not negligent by his own act, it is well recognized that his liability to the injured party is only secondary to that of the negligent employee . . .[and] [t]he employer therefore is entitled to indemnity for any payment of damages he is compelled to make from the employee who is primarily liable." Ragan v. Steen, 331 A.2d 724, 730 (Pa. Super. 1974);[4] see also Builders Supply Co. v. McCabe, 77 A.2d 368, 370 (Pa. 1951) ("[I]f a tort is committed by the employee or the agent[,] recovery may be had against the employer or the principal on the theory of respondeat superior, but the person primarily liable is the employee or agent who committed the tort, and the

---

[4] Under Pennsylvania law, "[i]ndemnity is a common law remedy which shifts the entire loss from one who has been compelled, by reason of some legal obligation, to pay a judgment occasioned by the initial negligence of another who should bear it." Kinney-Lindstrom v. Medical Care Availability and Reduction of Error Fund, 73 A.3d 543, 558 (Pa. 2013) (quotations omitted).

12

employer or principal may recover indemnity from him for the damages which he has been obliged to pay."); 41 Am. Jur. 2d Indemnity § 20 ("One is entitled to implied indemnification where he or she has committed no wrong but is held vicariously liable for the wrongdoing of another."). Indeed, "where suit [is] brought against both an employer and employee, and liability [is] established against the employer only through the application of the respondeat superior doctrine," the Pennsylvania courts "d[o] not question the employer's right to indemnity." Ragan, 331 A.2d at 730. No separate suit for indemnity is required by the vicariously liable party and, instead, where the parties' relationships and bases for liability are clear, a court may mold a verdict against an employer and employee to clarify that that the employer is entitled to indemnity. Id.

As a Court sitting in equity, I have even more latitude to consider the effect of these principles on the equitable contribution determination. Had the Esakoff Action proceeded to trial, a jury could have rendered a verdict against both Marquet-Sandt (Continental's insured) and Shady Maple (Penn National's insured). At that point, Penn National—as the insurer for a party that is only vicariously liable—could have, under unequivocal Pennsylvania law, received indemnity from Continental—as the insurer for the actively liable party—either through a molding of the verdict or via a separate indemnification action. The mere fact that the Esakoff Action ended in a settlement is of no moment. Just as Penn National could not have avoided liability by refusing to participate in the settlement, Continental could not extinguish Penn National's right to indemnity by settling the matter prior to a trial. Under well-settled principles of state law, Continental, as Marquet-Sandt's insurer, bore sole, ultimate responsibility for the debt paid in the Esakoff Action. Accordingly, I find that Continental is not entitled to equitable contribution from Penn National for any portion of the amount it paid to settle the Esakoff Action.

## IV.    CONCLUSION

In light of the foregoing, I will grant Continental's Motion to Amend and/or Alter Judgment on two grounds. First, I amend the March 12, 2021 opinion to reflect that my finding that Marquet-Sandt did not "borrow" the Yukon on behalf of Shady Maple does not resolve this entire case. Second, I supplement that opinion with the discussion set forth above and re-enter judgment in favor of Penn National and against Continental.

An appropriate Order follows.